The **BOARD OF EDUCATION OF the OKLAHOMA CITY PUBLIC SCHOOLS, INDEPENDENT DISTRICT NO. 89, OKLAHOMA COUNTY, OKLAHOMA, a Public Body Corporate, Jack F. Parker, Superintendent of the Oklahoma City, Oklahoma, Public Schools, M. J. Burr, Assistant Superintendent of the Oklahoma City, Oklahoma, Public Schools, Melvin P. Rogers, Phil C. Bennett, William F. Lott, Mrs. Warren F. Welch and Foster Estes, Members of the Board of Education of Oklahoma City Schools, Independent District No. 89, Oklahoma County, Oklahoma, and their Successors in Office, Appellants,**

v.

Robert L. **DOWELL** and Vivian C. Dowell, Infants, by A. L. Dowell, their Father and Next Friend, Edwina Houston Helton, a Minor, by her Mother, Gloria Burse, and Gary Russell, a Minor, by his Father, George Russell, Appellees.

No. 8523.

United States Court of Appeals Tenth Circuit.

Jan. 23, 1967.

Rehearing Denied March 15, 1967.

Certiorari Denied May 29, 1967.

See 87 S.Ct. 2054.

Breitenstein, Circuit Judge, dissented.

Coleman Hayes, of Monnet, Hayes, Bullis, Grubb & Thompson, Oklahoma City, Okl., for appellants.

Robert D. Looney, Oklahoma City, Okl., for amicus curiae, Harding High School Parents Teachers Assn.

Submitted on brief by Wheeler, Parsons, & Wheeler, Oklahoma City, Okl., for amicus curiae, Oklahoma Education Assn.

Jack Greenberg, New York City (James M. Nabrit, III, New York City, and U. Simpson Tate, Wewoka, Okl., on the brief) for appellees.

Before LEWIS, BREITENSTEIN and HILL, Circuit Judges.

HILL, Circuit Judge.

This appeal is from an order enjoining appellants to do certain enumerated administrative acts in order to effectuate racial desegregation in the public school system of Oklahoma City, Oklahoma.

The action was commenced in October, 1961, in the Western District of Oklahoma as a class action seeking equitable relief to enjoin the Board of Education of the Oklahoma City Public Schools and the other named defendants from "operating a qualified bi-racial school system * * *", from "maintaining a dual scheme, pattern or implied agreement or understanding of school zone lines based upon race or color", from maintaining "a minority to majority" system of pupil transfers and from continuing other racial discriminatory practices within the school system. A three-judge court was requested and convened because of the alleged unconstitutionality of certain state statutes pertaining to

the Oklahoma system of education. It was determined, after a pretrial, that the controverted issues left in the case did not require a three-judge court. Such court was dissolved and the case returned to the originally assigned judge.

The case proceeded to trial before one of the district judges, with the following issues involved: The validity of existing pupil transfer plan and the alleged racial discrimination resulting therefrom; racial discrimination in the assignment of teachers and other employees of the defendant school board; racial discrimination in the fixing of school attendance boundary lines; and the broad issue of racial segregation generally in the operation of the school system.

After an evidentiary hearing on July 11, 1963, the trial court rendered its first opinion.[1] There the pupil transfer plan, then being followed and under attack in the litigation, was held invalid under Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632.

A general finding, following specific findings of fact, was made that the board had not acted in good faith in its efforts to "integrate" the schools of the city but the court denied relief to some individual plaintiffs claiming personal discrimination because of lack of proof. One important aspect here of that order was the direction from the court to the school board to prepare and file with the court, within nintey days, a complete and comprehensive plan for the "integration" of the entire Oklahoma City School system and the court retained jurisdiction of the case to assure compliance with the decree.[2]

Pursuant to the order, the board filed what it called a "Program of Compliance with Court's Order". This statement by the board asserted it had established the school attendance boundaries by using only two criteria: (1) That they represent logically consistent geographical areas that support the concept of neighborhood schools and (2) that there be as

1. Dowell v. School Board of the Oklahoma City Public Schools, D.C., 219 F.Supp. 427.

2. In this opinion, the trial court made the following important and specific findings of fact:

"* * * The Court has searched the record carefully and finds no tangible evidence to show the defendants have made a good faith effort to integrate the public schools of Oklahoma City beyond the August 1, 1955 resolution, notwithstanding eight years have now passed, which is more time than necessary within which to begin to adjust the inequities which have existed unnecessarily so long, and the record is void of any evidence to indicate that the defendant School Board will make any improvement in the future." (219 F.Supp. at 435)

"The Court finds and concludes from the evidence that the School Board has not acted in good faith in its efforts to integrate the Oklahoma City Public Schools, as defined and required in the Brown cases, as to pupils and personnel. * * * The school children and personnel have in the main from all of the evidence been completely segregated as much as possible under the circumstances rather than integrated as much as possible. Inasmuch as the Superintendent of

Schools has established the proof necessary that Negro teachers are equal in quality to the white teachers, it seems only reasonable and fair that in all schools, mixed or otherwise, the School Board would and should make a good faith effort to integrate the faculty, in order that both white and Negro students would feel that their color was represented upon an equal level and that their people were sharing the responsibility of high-level teaching." (444, 445.)

"* * * Since August 1, 1955, the only integration has been in the fringe areas as between minority Negro residential pattern and the majority white residential pattern. For instance, there are 14 elementary and secondary schools that have some degree of integration, out of 101 school plants. However, the redistricting of schools has meant little or nothing in view of the policy 'minority to majority,' and as long as this policy is continued there will never be a good faith desegregation and integration of the public schools of the Oklahoma City district." (446.)

"From a study of the evidence in this case, the Court concludes that the Oklahoma City School Board has followed a course of integration as slowly as possible." (447.)

efficient as possible utilization of the building facilities available. The board stated that under no circumstances would it consider the race of the residents of an area in the school district either in the establishment or the adjustment of attendance area boundaries but that "Basically pupils will attend the schools which serve the attendance areas in which they reside." The board stated that it would no longer make special transfers on a racial minority to majority basis but would continue to grant transfers to enable a student to transfer out of his "neighborhood" school to another school where the transfer: (1) Would enable the student to take a course not available in his attendance area and the course "is important to the total education" of the student; (2) would enable members of the same family to go to school together; (3) would allow a student to complete the highest grade in a school he has been attending; or (4) for "other valid, good-faith reasons which justify approval." The board stated that "in no case will these reasons be based in whole or in part on race." The board asserted in general terms its intention to integrate faculty personnel extra-curricular activities, committee work, and "all types and kinds of activities involving student participation."

A hearing was held on August 8, 1963, upon the sufficiency of the plan filed by the board. After this hearing, the court instructed the board to file a new policy statement. On January 14, 1964, this statement was filed. In general terms, it reiterated the policies contained in the earlier plan filed with the court. After another hearing on this policy statement, the court found that while the board had presented "a very fine plan", there remained "doubt in the heart of the Negro pupils as to the good faith operation of the plan." The court thereupon requested the board to employ competent and unbiased experts, independent of local sentiment, to make a survey of the "inte-gration problem" as it related to the Oklahoma City public schools. The board declined the request, on grounds that it would be an unnecessary and unjustifiable expense and that the board itself was more qualified to assess local problems and was more sensitive to local needs. The court then invited the plaintiffs to present for its consideration the names of three experts in the field of "school integration". In due time, the plaintiffs moved the court to appoint Dr. William R. Carmack of Norman, Oklahoma, Dr. Willard B. Spaulding of San Francisco, California, and Dr. Earl A. McGovern of New Rochelle, New York,[3] to undertake a broad study of the Oklahoma City public schools and recommend to the court "a desegregation plan which will accord with the letter and spirit of Brown v. Board of Education, 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873] (1954)." On June 1, 1964, the motion was granted and an appropriate order entered.

Before considering the report of the three experts, a brief recital of the history of race segregation in the Oklahoma City schools is appropriate. School segregation of the races was written into the State Constitution. Separate but like school accommodations were required. State statutes implementing the Constitutional provision provided: For complete separation of the races in the public schools; school boards had to be composed exclusively of members of the white race; segregation was compelled in private educational institutions; and, any school official who permitted a child to attend school with members of the other race or any student who attended school with members of the other race was guilty of a misdemeanor. A pattern of racial segregation in housing was strictly adhered to with restrictive covenants in general use for many years. The Negro residents of the city had lived through the years mostly in the east and southeast portions of the city, thus the all-Negro schools were located in that

3. From the record these three men are eminently qualified in the area of public education and they have experience and proven ability in dealing with the problem of school segregation.

part of the city. This was the situation when the Supreme Court handed down the Brown decision.

In 1955, following Brown, the board enunciated a policy statement, by which school attendance boundaries were drawn and the "minority to majority" pupil transfer plan was announced.[4] The school system then began operation on the "neighborhood school attendance policy" with a feeder school plan. Attendance lines were drawn around the existing school buildings, taking into consideration student capacities of the buildings and natural boundaries such as rivers, highways and railroad lines and shifts in population. The feeder plan required students graduating from their particular elementary school to attend a designated junior high school and junior high school graduates to attend designated high schools. The minority to majority pupil transfer plan then permitted any student, who was enrolled in a school where his race was in the minority, to transfer to a school where his race was in a majority, provided space was available in the latter.

The record reflects very little actual desegregation of the school system between 1955 and the filing of this case. During that six year period segregation of pupils in the system had only been reduced from total segregation in 1955 to 88.3 percent in 1961. Total segregation still existed as to faculty members, administrative employees and all other supporting personnel within the system. Between the school years 1959–60 to 1964–65 the total number of all-white schools had increased from 73 to 81, the total number of all-Negro schools had increased from 12 to 14 and the total number of integrated schools from 7 to 12. Between the school years 1954–1955 and 1960–1961 the total Negro pupil population in the system had increased from 5,477 to 10,142, and by 1964–1965 it had increased to 12,503.

The court-appointed expert panel's report was completed and filed in January, 1965. It reflected that out of a total Negro or non-white school population of 12,503, in the school year 1964–65, about 10,000 or 80% attended all-Negro or predominantly Negro schools.[5] Thus, in the four school years during this litigation in the District Court, although the absolute number of Negroes in integrated schools more than doubled, only 8.3% of the relative Negro school population moved into integrated schools. To this it might be added that in 1961–62 there were 13 schools attended 95% or more by Negroes, and in 1964–65 there were 14 schools attended 95% or more by Negroes.

The board's special transfer policy which went into effect in the 1963–64 school year was given consideration by the panel. On the basis of figures showing that more white students than non-white students had been granted special

4. "Statement Concerning Integration Oklahoma Public School 1955–1956
 "August 1, 1955
 "All will recognize the difficulties the Board of Education has met in complying with the recent pronouncement of the United States Supreme Court in regard to discontinuing separate schools for white and Negro children. The Board of Education asks the cooperation and patience of our citizens in its compliance with the law and making the changes that are necessary and advisable. This action requires the Oklahoma Board of Education to change a system which has been in effect for centuries and which is desired for many of our citizens.
 "Boundaries have been established for all schools. These boundaries are shown on a map at the City Administration Building and maps are being distributed to each school principal. These new boundaries conform to the policies always followed in establishing school boundaries. They consider natural geographical boundaries such as major traffic streets, railroads, the river, etc. They consider the capacity of the school. Any child may continue in the school where he has been attending until graduation from that school. Requests for transfers may be made and each one shall be considered on its merits and within the respective capacity of the buildings."

5. A predominantly Negro school, as defined by the expert panel, is one having non-white enrollment of 95% or greater.

transfers, especially under the valid-good-faith reason test, the panel concluded that the policy provided "an effective loophole" for white school children.

The panel also dealt in some detail with the situation in the Oklahoma City School system with respect to the integration of faculty.[6] The panel concluded that "There was concrete evidence in [the school year of] 1964–65 that the Oklahoma City Public Schools were taking more vigorous steps to integrate the faculty of its integrated schools. These steps, however, only took place in previously integrated schools. In other words, little or nothing was done to integrate the staffs of schools that were all white or all non-white." Included in the panel's report was a plan for integration of the Oklahoma City public schools.

A hearing was held on the report in August, 1965, and the trial court, on September 7, ordered the Board of Education to prepare and submit a plan substantially identical to that set out in the report. Among the specific recommendations found in the report and embraced by the trial court's order were:[7]

(1) Combination of the Classen School (grades 7–12, all-white) and the Central School (grades 7–12, 69% white) attendance districts into a single district with one school housing grades 7–9, the other housing grades 10–12.

(2) Combination of the Harding School (grades 7–12, all white) and the Northeast School (grades 7–12, 78% white) attendance districts into a single attendance district with one school hous-ing grades 7–9, the other housing grades 10–12.

(3) A majority-to-minority transfer policy whereby, space permitting, students initially assigned to schools where their race is in the majority (over 50%) are entitled to transfer to schools where their race is in the minority.

(4) Desegregation of all faculty personnel so that by 1970 the faculty ratio of whites to non-whites in each school will be the same as the faculty ratio of whites to non-whites in the entire school system, subject to a reasonable tolerance of approximately 10%.

(5) In service education of faculty, including (a) city-wide workshops devoted to the consideration of school integration, (b) special seminars, and (c) special clinics.

From this order or decree of the court, this appeal was taken. After perfection of the appeal, the Harding High School Parents Teachers Students Association and the Oklahoma Education Association each was permitted to file a brief in the case as amicus curiae and participate in the oral argument.

Inherent in all of the points raised and argued here by appellants is the contention that at the time of the filing of this case there was no racial discrimination in the operation of the school system. That contention should be first considered. The question of the existence of racial discrimination necessarily goes hand in hand with the question of the good faith of the board in efforts to desegregate the system.

6. The panel defined "faculty" as including three categories of certified employees: (1) Those at work in the central administration of the Oklahoma City Public Schools; (2) Those who constitute non-teaching personnel at the individual schools; and (3) Teachers.

7. In addition, the order appealed from directed:
"1. That the Board prepare and submit by October 30, 1965, 'a further desegregation plan purposed to completely disestablish segregation in the public schools of Oklahoma City, Oklahoma, as to both pupil assignment and transfer procedure, and hiring and assignment of all faculty personnel.'"
"2. That the plan shall provide:
'(1) a statement of goals to be achieved,
'(2) descriptions of procedures to be followed to achieve such goals.
'(3) a statement of the personnel to be responsible for carrying out said procedures, and
'(4) a reasonably early time schedule of specific steps to be taken to attain the stated goals.'"

As we have pointed out, complete and compelled segregation and racial discrimination existed in the Oklahoma City School system at the time the Brown decision became the law of the land. It then became the duty of every school board and school official "to make a prompt and reasonable start toward full compliance" with the first Brown case. It is true the board, in 1955, issued the policy statement and implemented it by the drawing of school attendance lines and inaugurated a "minority to majority" pupil transfer plan. The attendance line boundaries, as pointed out by the trial judge, had the effect in some instances of locking the Negro pupils into totally segregated schools. In other attendance districts which were not totally segregated the operation of the transfer plan naturally led to a higher percentage of segregation in those schools.

The parties in their briefs vigorously contend the trial court exceeded its authority by, in fact, formulating a plan for the desegregation of the school system and compelling them to adopt and follow the plan. They further argue that the order appealed from usurps the functions of the board in that, by such order, the court has undertaken to operate and manage a school system, where there has been no Constitutional violation by the board.

We agree that in considering or reviewing acts of school boards and officials, generally, the power of a court of equity does not extend to the promulgation of rules or regulations to be adopted and followed by such boards and officials.[8] This does not mean that when a court of equity reaches the conclusion that unconstitutional racial discrimination in a school system exists, the power of the court ends. When the trial court here made such a finding and pointed out the areas of discrimination, it was the clear duty of the school authorities to promptly pursue such measures as would correct the unconstitutional practices. The courts are admonished by the second Brown case "In fashioning and effectuating the decrees, the courts will be guided by equitable principles." Also, after giving weight to public and private considerations, the courts must require "a prompt and reasonable start toward full compliance with * * *" the order of the court.[9]

The trial court was clearly within its equitable powers in ordering the board to present an adequate plan for desegregation of the school system. The board presented no plan, it only reiterated its general intention to correct some of the existing unlawful practices. This was not compliance with the order of the court. It was the existence of this factual situation, due entirely to the failure and refusal of the board to act, which created the necessity for a survey of the school system by a panel of experts. Even at this point, the trial court patiently refrained from compelling such a survey but asked the board to cause a survey of the school system to be made. It was only after the board's refusal of this request that the court appointed the three experts and directed them to make a survey.

Because of the refusal of the board to take prompt substantial and affirmative action after the entering of the court's decree, without further action by the court the aggrieved plaintiffs, even with a favorable decree from the court, were helpless in their efforts to protect their court-pronounced Constitutional rights. Under these circumstances it was the duty of the trial court to take appropriate action to the end that its equitable decree be made effective. Again, we go back to the second Brown case where the trial courts were directed "to take such proceedings and enter such orders and decrees consistent with this opinion as are necessary and proper to admit to public schools on a racially non-

8. See Downs v. Board of Education of Kansas City, 10 Cir., 336 F.2d 988, cert. denied, 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800.

9. Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.

discriminatory basis with all deliberate speed the parties to these cases."

Appellants lay great stress on this court's opinion in Downs v. Board of Education of Kansas City, 10 Cir., 336 F.2d 988, cert. denied, 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800, and urge that case requires a reversal in this case. We do not agree. Downs came to this court in a different setting than this case. Actually, about the only similarity between the two cases is the fact both involved the question of school desegregation. In Downs, after a lengthy evidentiary hearing, the trial court struck down a "minority to majority transfer plan and then held that the school board had acted in good faith in its efforts to comply with Brown, supra, and the subsequent cases involving school segregation. The evidence in Downs reflected that a definite plan had been adopted by the board to achieve desegregation of the school system and that very substantial progress had been made toward the goal of integration. In addition, the trial judge made an affirmative factual finding of good faith on the part of the board and substantial evidence supported the finding.

 As pointed out by appellants, we did not condemn or strike down the "neighborhood school attendance plan" in Downs, nor do we condemn such a plan here, if it is carried out in good faith and is not used as a mask to further and perpetuate racial discrimination. In Downs the trial court found the plan was not being used to deprive students of their Constitutional rights and here the trial court, in substance, found to the contrary. It is still the rule in this Circuit and elsewhere that neighborhood school attendance policies, when impartially maintained and administered, do not violate any fundamental Constitutional principle or deprive certain classes of individuals of their Constitutional rights.[10] We agree with one of the experts when he testified that the proposed plan does not ignore attendance boundaries or the neighborhood concept of such boundary lines. The majority to minority transfer plan, in conjunction with the attendance boundary plan, eliminates any question about Constitutional infirmities of the attendance boundary plan being followed in Oklahoma City.

The most important question raised by appellants is whether it was error for the trial court to order the board to include certain specific procedures in its broad plan of desegregation. Such action by a court of equity has seldom been necessary in the long line of desegregation cases decided since the Brown cases. This has been true because the school boards, generally, have accepted the court decrees as guidelines and proceeded "with deliberate speed" to formulate their own plans looking toward the objective of integration. But this was not the situation here. We need not recite again the facts in this record which conclusively show that for ten years after the board enunciated its intention to abide the mandate of Brown the board has taken only such action as it has been compelled to take and desegregation has been only of a token nature. Under the factual situation here we have no hesitancy in sustaining the trial court's authority to compel the board to take specific action in compliance with the decree of the court so long as such compelled action can be said to be necessary for the elimination of the unconstitutional evils pointed out in the court's decree. The procedures ordered by the trial court must be viewed in light of this test.

The first of those procedures requires the consolidation of Harding and Northeast districts and Classen and Central districts. Each of the old districts now maintains a school including the seventh through the twelfth grades. Upon consolidation, each of the two new districts would maintain two schools in the exist-

10. Downs v. Board of Education of Kansas City, 10 Cir., 336 F.2d 988, cert. denied, 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800; Springfield School Committee v. Barksdale, 1 Cir., 348 F.2d 261; Bell v. School City of Gary, Indiana, 7 Cir., 324 F.2d 209, cert. denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216.

ing facilities, one for the seventh through the ninth grades and the other for the tenth through the twelfth grades. The combination of Harding and Northeast would produce a racial composition of 91% white and 9% non-white; the combination of Classen and Central would produce a racial composition of 85% white and 15% non-white. The present racial compositions in the four schools are: Harding 100% white, Northeast 78% white, Classen 100% white and Central 69% white. Under the new plan, the amount of traveling required by pupils in the merged districts would be no greater than some pupils in other parts of the system are now required to travel and no bussing problem arises from the merger. The court recognized this fact and expressly eliminated the necessity for bussing in its plan. It is obvious this part of the plan would result in a broader attendance base and in a better racial distribution of the pupils.

We pass to consideration of the part of the order compelling faculty desegregation. The record reflects that a higher percentage of non-white teaching personnel have master's degrees than do white personnel. The superintendent of schools admitted there was no difference in the quality of performance between the white and non-white personnel. At present, integration of personnel exists only in schools having both white and non-white pupils, with no non-white personnel employed in the central adminis-

tration section of the system. The existing situation reflects racial discrimination in the assignment of teachers and other personnel. The order to desegregate faculty is certainly a necessary initial step in the effort to cure the evil of racial segregation in the school system.[11]

To support the necessity for the required new "majority to minority" pupil transfer plan, we must again look to the trial court's findings of fact and the parts of the record in support of them. Appellants argue, such a requirement may be said to be compelling integration, rather than prohibiting racial discrimination.

From 1955 until the court decree in 1963, the board used the "minority to majority" pupil transfer plan. The effect of this plan is fully set out in the court's decree and the plan was held invalid by that decree. The board readily acquiesced in this invalidation and instituted a new transfer plan. By this policy the evils of the first plan were perpetuated by allowing all pupils who had been transferred under the "minority to majority" plan to remain in the school to which the transfer was made. In addition, a brother or sister of such transferred student is permitted to transfer to the same school.[12] Also, the plan contains what the board calls "the finding of other valid, good faith reasons which justify approval of transfers." These three provisions in the existing

---

11. See Bradley v. School Board of the City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187; Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265; Singleton v. Jackson Municipal Separate School District, 5 Cir., 355 F.2d 865; Board of Public Instruction of Duval County, Florida v. Braxton, 5 Cir., 326 F.2d 616, cert. denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 and Kemp v. Beasley, 8 Cir., 352 F.2d 14.

12. As the District Court said in the order appealed from:
 "Certain provisions of the special transfer policy, including, but not limited to, the provision permitting transfer to make it possible for two or more members of

the same family to attend the same school, the provision allowing a pupil to complete the highest grade in a school which he has been attending, and the provision permitting transfer for valid, good faith reasons, give a continuing effect to the 'minority to majority' transfer rule invalidated in this Court's July, 1963, opinion. Under the provisions set forth above, pupils who obtained transfers away from their neighborhood schools to segregated schools under the 'minority to majority' transfer policy are not only permitted to remain in such schools, but also provide a basis for enabling all brothers and sisters to follow them from the schools near their residences to segregated schools."

transfer plan enabled segregation by transfer in the school system in much the same way it had been done under the "minority to majority" plan.[13] The court so held and the record amply supports such a finding.

The court-ordered transfer plan places no bussing requirement on the school system. Neither does it give the student unlimited discretion in deciding where he will attend school because a transfer can be made only "if space permits." On the other hand, the new transfer plan will enable any Negro student in the system, who so desires, to enjoy the desegregated education to which he has so long been entitled and yet of which he has been inexcusably deprived. In view of the long wait the Negro students in Oklahoma City have been forced to endure, after their rights had been judicially established, we think that requiring the new transfer plan was within the court's power to eliminate racial segregation.

By paragraph 5 of the September 7, 1965, order of the court, the board was directed to include in its plan "In service education of faculty; * * *" and would require city-wide workshops, special seminars and special clinics for teachers and administrative personnel within the school system. Such a program may very well be a desirable and worthwhile effort but we are unable to say that compelling such action is necessary for the elimination of the unconstitutional evils sought to be corrected by the decree. Therefore, the decree should be modified so as to eliminate this requirement.

It must be conceded Oklahoma City, not unlike many other similarly situated localities, has a problem but that problem must be faced up to. Delay and evasiveness will not aid in its solution. This court certainly cannot say the methods of solution proposed by the panel of experts and embraced by the decree are the only or the best ones. It may very well be necessary for the board to inaugurate new and additional procedures to overcome the unconstitutional evil of racial discrimination. It is not our function to propose methods or procedures. The long line of court decisions pertaining to desegregation handed down since 1954 is conclusive proof that no single formula provides the sole remedy to cure the unconstitutional and intolerable evil of racial discrimination. The appropriate remedy in each instance depends upon the varient facts and circumstances. We conclude that the remedy employed by the court below, with the exception noted, is appropriate in view of the facts and circumstances of this case.

The court appropriately retained jurisdiction of the case and jurisdiction should be held until such time as the court is satisfied that the decreed unconstitutional practices are eliminated and appellant board is found to be in full compliance with the teachings of the Brown case. The decree appealed from is approved and affirmed in all respects except for the provision requiring "in service education of the faculty" which should be eliminated therefrom. The case is therefore remanded for further proceedings consistent herewith.

LEWIS, Circuit Judge (concurring).

The result dictated by this disturbing case is largely determined by the premise from which reasoning springs and the terminology used in advancing argu-

13. The District Court found that:
"The special transfer policy as presently administered tends to permit transfers for reasons no different or more valid than those obtained under the now voided 'minority to majority' transfer rule. Such policy tends to perpetuate a segregated system, violates the Board's asserted belief in the philosophy of the neighborhood school system and, for several economic and sociological reasons, deprives Negro pupils assigned to predominantly Negro schools who are less able to obtain such transfers, of the opportunity to obtain a desegregated education."

ment. I start with the premise of the trial court's finding that the Board of Education, despite statements of completely acceptable policy, had not acted in good faith in effectuating such policies after having been afforded opportunity to do so. The authority of the trial court under such circumstances to prescribe positive action for purposes of curing a continuing situation that has traditionally denied to many a constitutional right, as with legislative re-apportionment problems, seems firmly established. But, of course, the cure cannot survive if it in turn reflects an unconstitutional imposition, and in this regard terminology can become a persuasive tool in analysis.

I have no quarrel with the statement that forced integration when viewed as an end in itself is not a compulsion of the Fourteenth Amendment. But any claimed right to disassociation in the public schools must fail and fall. If desegregation of the races is to be accomplished in the public schools, forced association must result, not as the end sought but as the path to elimination of discrimination. And, to me, the argument that racial discrimination cannot be eliminated through factors of judicial consideration that are based upon race itself is completely self-denying. The problem arose through consideration of race; it may now be approached through similar but enlightened consideration.

Again noting that the case reaches us for review of the affirmative action of the trial court it seems proper to emphasize that we do not set out consolidation of schools and the majority-to-minority transfer policy as compulsive instruments to accomplish desegregation. But we do hold that such means are not violative of the constitutional rights of any and might properly have been utilized by the School Board, and, in its stead, were available to the trial court. The contrasting policy of minority-to-majority transfer, denied in *Goss*, perpetuated discrimination; here, a start is made toward full compliance with *Brown*.

BREITENSTEIN, Circuit Judge (dissenting).

The district court made a general finding that the Board of Education had not acted in good faith to desegregate the Oklahoma City public schools. This finding is not supported by any specific and uncorrected discriminatory practices. The court has assumed the authority to tell the Board how it shall perform some of its public duties to the end that integration may be attained.

My basic difference with the majority is that I see nothing in the Fourteenth Amendment that compels integration. To me discrimination and integration are entirely different. Discrimination is the denial of equal rights. Integration is compulsory association. Each is concerned with individual rights and each must be tested against the same constitutional standards.

The trouble with this case is that it deals with generalities rather than specifics. Discriminatory practices are bad and must not be condoned. Here the court does not find any explicit discriminatory act. It says that the Board has not acted in good faith in the preparation of a plan for integration and forces details of a plan on the Board. I believe that the courts should confine their decisions to actual controversies related to specific rights and should not take over the operation of public affairs entrusted to other governmental institutions.

Prior to Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, the Oklahoma schools were segregated. Promptly after that decision the Board opened the schools to all. It did unwisely adopt a minority-to-majority transfer policy but promptly after Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632, it abandoned that policy and set up a transfer system which gave no regard to race. There is no evidence that since the adoption of that system any child of any race has been discriminated against. The unsupported suspicion of the plaintiffs' experts that the operation of the transfer policy has re-

dounded to the disadvantage of negro children is insufficient basis for a finding of discrimination when weighed against the Board's positive evidence of no discrimination.

The dissatisfaction of the court with the Board's refusal to accept the court's request for the employment of experts is no basis for the decision rendered. Judicial pique cannot replace the actual infringement of a constitutionally protected right.

The court ordered the Board to submit "a further desegregation plan." In my opinion this portion of the order is not appealable. See Taylor v. Board of Education, 2 Cir., 288 F.2d 600. The court said that the plan should provide new district lines for four schools. The effect is to consolidate, in two instances, a junior high school district with a senior high school district. No finding is made as to the physical characteristics of the facilities or to the types of curriculum. In my opinion this is a gratuitous, judicial interference with the duties and responsibilities of the Board, is made without any supporting findings except the possibility of thereby in the future reducing the imbalance of the races, and is not required to protect any Fourteenth Amendment right. If the Board believes it appropriate to redraw district lines to alleviate racial imbalance, it may do so and any person who believes himself aggrieved by such action may seek judicial relief. Action by the Board is vastly different from action by the court.

In my opinion the judicial compulsion of the majority-to-minority transfer policy is indefensible. The Goss decision says (373 U.S. 687, 83 S.Ct. 1408): "Classifications based on race for purposes of transfers between public schools, as here, violate the Equal Protection Clause of the Fourteenth Amendment." A majority-to-minority transfer is based on race. No more need be said. If the Board determines to use transfers to alleviate racial imbalance, it may do so with the qualification that a person who believes his constitutional rights are infringed thereby may seek judicial relief.

The court ordered desegregation of faculty personnel "so that by 1970, the ratio of whites to non-whites assigned in each school of the defendants' system will be the same" with a 10% leeway. Here again we have a classification based on race. The stated policy of the Board is: "Opportunity to apply for and be equal for any positions that may be available in the school system will be given to all without regard to race, color, creed, religion, or national origin." The record is devoid of any evidence that the Board has deviated from this policy in any regard. In my opinion the Board policy is constitutionally correct and the court order on faculty integration is wrong.

I agree with the majority that the provision of the order for in-service faculty education cannot be sustained.