606 F.Supp. 1548 (1985)
Robert L. DOWELL, et al. Plaintiffs,
v.
BOARD OF EDUCATION of the OKLAHOMA CITY PUBLIC SCHOOLS, et al. Defendants,
Applicant for Intervention: Yvonne Monet Elliot and Donnoil S. Elliot, both minor children, by and through their parent and guardian, Donald R. Elliot; Diallo K. McClarty, a minor child, by and through his parent and guardian, Donna R. McClarty; Donna Chaffin and Floyd Edmun, both minor children, by and through their parent and guardian, Glenda Edmun; Chelle Luper Wilson, a minor child, by and through her parent and guardian, Clara Luper; Donna R. Johnson, Sharon R. Johnson, Kevin R. Johnson, and Jerry D. Johnson, all minor children, by and through their parent and guardian, Betty R. Walker; Lee Maur B. Edwards, a minor child, by and through his parent and guardian, Elrosa Edwards; Nina Hamilton, a minor child, by and through her parent and guardian, Leonard Hamilton; Jamie Davis, a minor child, by and through his parent and guardian, Etta T. Davis; and Romand Roach, a minor child, by and through his parent and guardian, Cornelia Roach.
No. CIV-9452.
United States District Court, W.D. Oklahoma.
April 25, 1985.
*1549 John W. Walker, Little Rock, Ark., Ted A. Shaw, New York City and Lewis Barber, Jr., and Jethro Curry, Oklahoma City, for petitioners.
Ronald L. Day, Oklahoma City, for defendant Bd. of Educ.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
BOHANON, District Judge.
On February 19, 1985, the petitioners filed a Motion to Reopen this desegregation case to challenge the constitutional validity of a recently proposed Student Reassignment Plan which curtails cross-town busing in Oklahoma City of elementary school children in grades one through four. In their motion, petitioners allege that the Oklahoma *1550 City School District has not achieved unitary status, and that the School Board's proposed plan creates racially identifiable neighborhood schools thereby resegregating the Oklahoma City School District.
On March 6, 1985, the defendant School Board filed a Response to Petitioners' Motion alleging the school district became unitary in 1977 and that the proposed plan was justified and constitutional.
On March 13, 1985, the court entered an Order finding that petitioners' Motion and defendants' Response joined the issues, and set the Motion to Reopen down for an evidentiary hearing. The hearing was conducted on April 15 and 16, 1985. At the hearing the petitioners were represented by John W. Walker of Little Rock, Arkansas, Ted A. Shaw of New York City, New York, Lewis Barber, Jr., of Oklahoma City, Oklahoma, and Jethro Curry of Oklahoma City. The defendant Board of Education was represented by Ronald L. Day of Oklahoma City.

Case History
This action was originally commenced in October, 1961, as a class action seeking equitable relief against the Oklahoma City Board of Education for operating a statecompelled dual system of education. In July, 1963, this court handed down its decision finding that the Oklahoma City School Board's refusal to grant a transfer to a black student from a predominantly black school to a predominantly white school constituted unlawful race discrimination. Dowell v. School Board of the Oklahoma City Public Schools, 219 F.Supp. 427 (1963). During the years that followed, this case again came before this court and appellate courts on issues relating to the Oklahoma City School Board's obligation to convert a state-compelled dual school system into a unitary system which would eliminate racial discrimination.
In February, 1972, after conducting many hearings, this court ordered the Oklahoma City School Board to implement what came to be known as the "Finger Plan." Dowell v. Board of Education of the Oklahoma City Public Schools, 338 F.Supp. 1256 (W.D.Okl.1972). Under the Finger Plan, high school attendance zones (grades 9-12) were restructured so that each high school enrolled both black and white pupils. To accomplish this, an elementary school feeder system was used so that students were assigned to a high school based on the elementary school attendance zone in which their home was located. Similarly, middle schools (grades 6-8) were desegregated by the establishment of attendance zones for each school. At the elementary level all majority black schools were converted to fifth year centers, while all other schools were to serve grades 1-4. White students in the group attended their neighborhood school for grades 1-4, and attended the formerly black schools for the fifth grade. Black students formerly assigned to the schools now used as fifth year centers were split up and attended the majority white schools for grades 1-4. Black students in fifth grade attended the fifth grade center which was previously their neighborhood school. Elementary schools located in naturally integrated neighborhoods qualified for an exception to the general plan known as "stand alone" status, a term to be explained further infra, and operated as schools enrolling grades kindergarten through fifth. Kindergartens existed at each elementary school and were permitted to continue without forced desegregation through busing. Parents of kindergarten children were given the freedom to choose the school their child attended. The freedom of choice was justified because it permitted kindergarten children to go to the school in the vicinity of the place where their mother was working, or to walk to kindergarten with other siblings or neighborhood children. Id. at 1267-1268.
The court's decision in February, 1972, implementing the Finger Plan was upheld on appeal. Dowell v. Board of Education of the Oklahoma City Public Schools, 465 F.2d 1012 (10th Cir.1972), cert. denied 409 U.S. 1041, 93 S.Ct. 526, 34 L.Ed.2d 490 (1972).
The Oklahoma City Board of Education implemented and properly operated the *1551 Finger Plan for several years. After the Finger Plan had been in operation for some time, the Board of Education filed a "Motion to Close Case" on the grounds that it "[had] eliminated all vestiges of state-imposed racial discrimination in its school system and [was] ... operating a unitary school system." Thereafter, the court conducted a hearing to receive evidence from plaintiffs and defendants concerning the state of desegregation in the Oklahoma City public schools, and on January 18, 1977, entered an order relinquishing its jurisdiction and terminating this case. The "Order Terminating Case" states in pertinent part as follows:
... [T]he School Board, under the oversight of the Court, has operated the Plan properly, and the Court does not foresee that the termination of its jurisdiction will result in the dismantlement of the Plan or any affirmative action by the defendant to undermine the unitary system so slowly and painfully accomplished over the 16 years during which the cause has been pending before the Court."
. . . . .
Now sensitized to the constitutional implications of its conduct and with a new awareness of its responsibility to citizens of all races, the Board is entitled to pursue in good faith its legitimate policies without the continuing constitutional supervision of this Court....
ACCORDINGLY, IT IS ORDERED:
1. The Biracial Committee established by the Court's Order of December 3, 1971, which has been an effective and valued agency of the Court in the implementation of the Plan, is hereby dissolved;
2. Jurisdiction in this case is terminated ipso facto subject only to final disposition of any case now pending on appeal. (emphasis added)
Plaintiffs did not appeal the Order Terminating Case. To this date the Oklahoma City Board of Education continues to implement the substance of the Finger Plan with minor modifications. There has been no attempt to revive or reopen this case during the eight years which passed from the time this court terminated its jurisdiction until the present contest.

Findings of Fact
1. One of the many elements of the Finger Plan carried forward by the Oklahoma City Board of Education was the provision for kindergarten through fifth grade (K-5) "stand alone" schools. That is, when racial balance in a neighborhood is achieved through natural integration the elementary school qualifies as a K-5 "stand alone" school. When this status is achieved, the fifth grade is returned to the elementary school, and children are no longer bused into or out of the elementary school to achieve racial balance.
2. As the years passed by, more and more neighborhoods in Oklahoma City became naturally integrated. By mid-1984, more than twelve years after the Finger Plan had been in operation, more than a dozen elementary schools were located in neighborhoods with a racial balance that qualified them for "stand alone" school status.
3. In 1984 the Board of Education recognized Bodine Elementary School in southeast Oklahoma City as a K-5 "stand alone" school. In the process, the School Board noticed certain inequities (hereinafter identified) starting to surface with the advent of more and more schools qualifying for K-5 "stand alone" status.
4. On July 16, 1984, the Board of Education appointed a committee to study the school district's K-5 schools, and to report back to the Board with positive recommendations. The committee consisted of three School Board members. Dr. Clyde Muse, who is black and has a Ph.D. in education, chaired the committee. Also on the committee were Mrs. Susan Hermes and Mrs. Betty Hill. Both of these School Board members had prior experience as certified school teachers. The committee frequently called upon the school district's research department for data and statistics needed during the study. During the time the committee was meeting, Dr. Muse traveled *1552 to the Office of Civil Rights in Dallas, Texas, for consultation and advice.
5. On November 19, 1984, the committee presented a report to the entire Board concerning its study on the far-reaching effects of an increased number of K-5 "stand alone" schools, and recommended that the Board adopt a new Student Reassignment Plan which, among other things, eliminated K-5 "stand alone" schools.
6. The committee study revealed that as more neighborhoods become naturally integrated and their schools qualify for K-5 "stand alone" status, the young black students previously bused into those schools would have to be reassigned to other schools. Since most of the naturally integrated schools are centrally located in the City, the reassignment of young blacks would be to schools located further north, west or south. The effect would be to increase the busing burden in terms of time and distance on young black children in the first through fourth grades. Further, the committee pointed out that when a "stand alone" school reacquires its fifth grade, this causes the student population at the fifth year centers located in the northeast quadrant of the district to drop, and the centers to be subjected to closing.
7. Also, the committee was concerned with the decline of parental involvement in the schools, and wanted a plan which would have the effect of increasing parental involvement. Curriculum uniformity was also a consideration of the committee. All fifth year centers have enrichment programs including intramurals, string instruments, the Opening Doors program and special interest sessions. The committee felt it would be increasingly difficult to make these fifth year center programs equally available within the new K-5 "stand alone" schools.
8. After the committee made its report and submitted its recommendation, public hearings were conducted at various schools throughout the community to discuss the proposed plan. Thereafter, a special School Board meeting was conducted on December 10, 1984, so that anyone in the community could state their views and make suggestions about the proposed plan directly to the Board of Education. The Superintendent of Schools sent copies of the proposed plan to the Office of Civil Rights, and invited personnel from the Office of Civil Rights to attend the public hearings where the proposed plan was being discussed.
9. As a result of positive input from the public, the committee recommended that certain specific amendments not affecting the overall character of the plan be made. Thereafter, on December 17, 1984, the Oklahoma City Board of Education unanimously adopted the Student Reassignment Plan which is to go into effect at the commencement of the 1985-86 school year.
10. The fundamental elements of the plan, admitted into evidence as plaintiffs' Exhibit # 1 and incorporated by reference in these findings of fact, are as follows:
(a) The Plan calls for K-4 neighborhood schools throughout the district. This eliminates compulsory busing of young black children, grades 1-4, to elementary schools outside their immediate neighborhood;
(b) An equity officer is to monitor all schools to insure the equality of facilities, equipment, supplies, books and instructors in all schools. An equity committee is to assist the equity officer and recommend ways to integrate students at any racially identifiable elementary schools several times each year;
(c) A "majority to minority" transfer policy will allow elementary students assigned to a school where their race is in the majority to obtain a transfer to a school in which their race will be in the minority. The transfer option is encouraged through district-provided transportation;
(d) All faculties and staff will remain integrated at all schools in the district; and
(e) Fifth year centers will be located in all sections of the school district. All fifth year centers, middle schools, and high schools in the school district will *1553 continue to be racially balanced with the aid of busing.
11. Population changes have occurred in the Oklahoma City School District from the time the Finger Plan was implemented. In 1970, 325,000 people lived in the school district. In 1980, 305,000 people lived in the school district. In 1971, 68,840 students attended school in the district. In 1985, 40,375 students attend school in the district. In 1971, the student population was 23.4% black. In 1985, the student population is 38.3% black. In 1971, the student population was 76.6% white. In 1985, the student population is 49.6% white. (The failure of the 1985 figures to add up to 100% is due to the exclusion of non-black minorities from the figures used to calculate percentages of whites and blacks. This apparently was not done with the figures presented to the court in 1971.)
12. Presently, the racial composition of the faculty and staff serving Oklahoma City Public Schools is as follows:

Teachers 30.4% black
Principals 28.4% black
Other Administrators 35.5% black
Coaches 45.6% black
Counselors 41.3% black
Special Ed. Teachers 30.2% black
Support Personnel 45.9% black

Also, the Oklahoma City Board of Education has in the past and continues to implement and follow an affirmative action plan. At present, racial balance within 15 percentage points of the proportions in the system-wide student population is maintained in all classes in grades 1-12 through busing.
13. Under the Student Reassignment Plan there will be 64 elementary schools. Eleven of those schools will be ninety percent (90%) or more black. Twenty-two of the 64 elementary schools will be ninety percent (90%) or more white and non-black minorities. The remaining 31 elementary schools will be racially mixed between blacks and non-blacks. The Oklahoma City Board of Education has neither altered the boundaries to these elementary schools so as to create a certain number of racially identifiable schools, nor attempted to fix or alter demographic patterns to affect the racial composition of its schools.
14. Under the Student Reassignment Plan the curriculum in all the elementary schools will be the same. The special education programs offered in all schools will be the same. The student-teacher ratio in all schools remain the same. Facilities, equipment, supplies and textbooks will be equal. As was pointed out previously, the faculties and staffs at each elementary school will remain integrated.
15. In the early 1970's, there were approximately 94 parent-teacher associations within the school district with a total membership in excess of 25,000 people. Presently, there are only 14 parent-teacher associations and the membership is less than 5,000. Parental involvement is an essential ingredient to a quality education. The Board of Education previously took steps in an effort to increase parental involvement. An attempt was made to implement a district-wide parents council. School Board meetings were moved out into the community. Buses were sent to certain schools to pick up parents for meetings. However, these efforts failed. The court finds that the degree of parental involvement in the schools is a legitimate concern of the Board of Education, and that the School Board's proposed plan will have the effect of increasing parental involvement at the elementary school level.
16. Student participation in extracurricular activities is also an essential ingredient to a quality education. The School Board's proposed plan will give elementary students a greater opportunity to participate in such activities.
17. The School Board has a genuine concern for maintaining schools in all areas that the school district serves. Also, the amount of time and distance traveled by elementary school children on buses is a genuine concern of the Board of Education.
18. The Board of Education adopted the Student Reassignment Plan for legitimate purposes: to protect against the loss of schools in the northeast quadrant of the district; to maintain fifth year centers *1554 throughout the district; to reduce the busing burden on young black students; to increase parental and community involvement in the schools; and to improve programs and provide elementary children with a greater opportunity for participation in extracurricular activities.
19. The Student Reassignment Plan is not discriminatory, and it was not adopted by the Oklahoma City Board of Education with the intent to discriminate on the basis of race or with a deliberate purpose to affect the racial composition of the schools. Any change in the racial composition of the schools that may be expected to result from the plan is an unintended and largely unavoidable consequence of other objectives sought for the benefit of all students. The court is convinced that the Board of Education is equally concerned about the health, education and well-being of both black students and white students.
20. The School Board members on the committee who recommended the Student Reassignment Plan were qualified by virtue of their educational background and experience to conduct the study and formulate the various components of the Student Reassignment Plan. The Student Reassignment Plan is educationally sound, and when implemented, will accomplish the objectives of the Board of Education.

Conclusions of Law
1. The Supreme Court in Green v. New Kent County School Board, 391 U.S. 430, 437-38, 88 S.Ct. 1689, 1693-94, 20 L.Ed.2d 716 (1968), held that once it is determined that a school district is operating a dual system, then the school authorities are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." In Green, the Court identified six components of a school system which must be desegregated before the entire system can achieve unitary status: faculty, staff, transportation, extracurricular activities, facilities, and composition of the student body. Id. at 435, 88 S.Ct. at 1692.
2. The specific question of when a district court should declare a school system "unitary" and terminate its remedial jurisdiction has been addressed by the Supreme Court and the Tenth Circuit Court of Appeals. The Supreme Court in Raney v. Board of Education, 391 U.S. 443, 449, 88 S.Ct. 1697, 1700, 20 L.Ed.2d 727 (1968) held that "in light of the complexities inhering in the disestablishment of state-established segregated school systems, Brown II contemplated that the better course would be to retain jurisdiction until it is clear that disestablishment has been achieved." Similarly, in an earlier decision in this very case, the Tenth Circuit Court of Appeals stated that "jurisdiction should be held until such time as the court is satisfied that the decreed unconstitutional practices are eliminated and appellant board is found to be in full compliance with the teachings of the Brown case." Board of Education of Oklahoma City Public Schools v. Dowell, 375 F.2d 158, 168 (10th Cir.1967).
3. This court in its 1972 order directing the implementation of the Finger Plan recognized that the court "was required to retain jurisdiction to evaluate the Plan in practice and to see that state imposed segregation was completely removed." Dowell v. Board of Education of the Oklahoma City Public Schools, 338 F.Supp. 1256, 1258, footnote 1 (W.D.Okl.1972).
4. At the time this court totally relinquished its jurisdiction over this case in 1977, the court was convinced that the Finger Plan had been carried out in a constitutionally permissible fashion and that the School District had reached the goal of being a desegregated non-racially operated and unitary school system. In the Order Terminating Case this court specifically found that the School Board had complied with the requisite constitutional requirements and recognized that a "unitary system" had been "accomplished" over the previous sixteen years. The Order Terminating Case was not appealed, and no attempt to revive or reopen this litigation was made during the eight years which passed from the time the Order was entered *1555 in 1977 until the Motion to Reopen was filed in 1985.
5. The Supreme Court has approved the view that the fact that a case is in the nature of a suit in equity, authorized by 42 U.S.C. § 1983, as is this one, "presents no categorical bar to the application of res judicata and collateral estoppel concepts." Allen v. McCurry, 449 U.S. 90, 97, [101 S.Ct. 411, 416, 66 L.Ed.2d 308] (1980). These concepts were explained by the Court as follows:
Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Cromwell v. County of Sac, 94 U.S. 351, 352 [24 L.Ed. 195]. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case. Montana v. United States, 440 U.S. 147, 153 [99 S.Ct. 970, 973, 59 L.Ed.2d 210]. As this Court and other courts have often recognized, res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication. Id., at 153-154 [99 S.Ct. at 973-974].
Id. at 94, 101 S.Ct. at 414. In the present case, this court's finding in 1977 that a unitary system had been achieved by the Oklahoma City public schools is res judicata as to those who were then parties to this action. At the time of that Order, the plaintiffs in this action represented the entire class of school-aged black children within the Oklahoma City Public School District, and the present petitioners acknowledge that this class included future black children. At the very least, the present applicants for intervention, appearing through their parents and guardians, seek to represent a similarly-defined class of black children and are themselves members of said class. Though the individual members of this class may have changed with the passage of time, this change cannot defeat the preclusive effect of this court's original finding of unitariness. Courts have held that even when a first case was a so-called "spurious" class action "a public body should not be required to defend repeatedly against the same charge of improper conduct if it has been vindicated in an action brought by a person or group who validly and fairly represent those whose rights are alleged to have been infringed." Bronson v. Board of Education, 525 F.2d 344, 349 (6th Cir.1975) cert. denied, 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976) (emphasis in original). There has been no showing in this case that the original plaintiffs did not validly and fairly represent all those whose rights are concerned here. The present petitioners are, therefore, collaterally estopped from relitigating the issue of the unitary character of the Oklahoma City Public Schools as of 1977 even if res judicata itself is not strictly applicable to the facts of this attempted class intervention. Id.; see Bell v. Board of Education, 683 F.2d 963 (6th Cir.1982); L.A. Unified School District v. L.A. Branch NAACP, 714 F.2d 935 (9th Cir.1983) (Bronson cited with approval, but res judicata found to be the more applicable doctrine under the circumstances of the case).
6. Furthermore, this court finds that the Oklahoma City School District displays today, as it did in 1977, all indicia of "unitariness." It has now been thirteen years since cross-town busing was introduced and almost twenty-five years since the start of desegregation litigation in Oklahoma City. The evidence in this case demonstrates that the Oklahoma City School District remains unitary today. The School Board, administration, faculty, support staff, and student body are integrated. Further, transportation, extracurricular activities and facilities within the school district are equal and non-discriminatory. This court's finding of unitariness in 1977 was fully justified, and remains a finding which is today fully justified.
7. Supreme Court precedent is clear that once a school system has become *1556 unitary, the task of a supervising federal court is concluded. "Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system." Swann v. Charlotte-Mecklanburg Board of Education, 402 U.S. 1, 31-32, 91 S.Ct. 1267, 1283-1284, 28 L.Ed.2d 554 (1971). Where unitary status has been achieved, district court intervention is normally not necessary unless there is a showing that the school district "has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools." Id. at 32, 91 S.Ct. at 1284. "[H]aving once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, [a District Court has] fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns." Pasadena City Bd. of Education v. Spangler, 427 U.S. 424, 436-37, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976).
8. The Tenth Circuit Court of Appeals has recognized "that neighborhood school attendance policies, when impartially maintained and administered, do not violate any fundamental Constitutional principle or deprive certain classes of individuals of their Constitutional rights." Board of Education of Oklahoma City Public Schools v. Dowell, 375 F.2d 158, 166 (10th Cir.1967), cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967).
9. Also, the Supreme Court has recognized that in a system that has not been deliberately constructed and maintained to enforce racial segregation, "it might well be desirable to assign pupils to schools nearest their homes." Swann, 402 U.S. at 28, 91 S.Ct. at 1282.
10. Congress has also passed legislation recognizing the desirability of neighborhood schools. 20 U.S.C. § 1701 states:
(a) The Congress declares it to be the policy of the United States that
(1) all children enrolled in public schools are entitled to equal educational opportunity without regard to race, color, sex or national origin; and
(2) the neighborhood is the appropriate basis for determining public school assignments.
The fact that the Student Reassignment Plan adopted by the Oklahoma City Board of Education calls for neighborhood schools in grades K-4 does not offend the Constitution.
11. In Swann, the Supreme Court noted that, "the constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." 402 U.S. 24, 91 S.Ct. 1280. Furthermore, the existence of some one-race schools within a district "is not in and of itself the mark of a system that still practices segregation by law." Id. at 26, 91 S.Ct. at 1281.
12. The existence of racially identifiable schools is not unconstitutional without a showing that such schools were created for the purpose of discriminating on the basis of race. Keyes v. School District No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). The presence of discriminatory intent may not be inferred solely from the disproportionate impact of a particular measure upon one race. The Supreme Court has clearly stated that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 562-63, 50 L.Ed.2d 450 (1977); Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The Student Reassignment Plan was not created for the purpose of discriminating on the basis of race.
13. The Supreme Court has recognized the optional majority-to-minority transfer provision as a useful part of a desegregation plan. Swann, 402 U.S. at 26-27, 91 S.Ct. at 1281.
14. The Supreme Court has also acknowledged that:

*1557 An objection to transportation of students may have validity when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process... [L]imits on time of travel will vary with many factors, but probably with none more than the age of the students involved.
Swann, 402 U.S. at 30-31, 91 S.Ct. at 1283.
15. The decision whether a case should be reopened under Federal Rule 60(b)(6) is discretionary. Special circumstances must be shown in order to justify relief under this rule. Stewart Securities Corp. v. Guaranty Trust Co., 71 F.R.D. 32 (W.D.Okl.1976). The Student Reassignment Plan of the Oklahoma City Board of Education is constitutional, and special circumstances are not present which would justify reopening this litigation.
An appropriate order will accordingly be entered herein.

ORDER
In accordance with the findings of fact and conclusions of law entered herein this day,
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Motion to Reopen Case, to Intervene and For Further Relief filed by the applicants for intervention is denied.