**Leola Pearl BECKETT et al., Plaintiffs, Carlotta Mozelle Brewer et al.**

**and**

**United States of America, Plaintiff-Intervenors,**

**and**

**Oliver L. Rosso et al., Excepting-Intervenors,**

**v.**

**The SCHOOL BOARD OF the CITY OF NORFOLK, VIRGINIA et al., Defendants.**

**No. 2214.**

United States District Court
E. D. Virginia,
Norfolk Division.

May 12, 1967.

J. Hugo Madison, Victor J. Ashe, Norfolk, Va., Henry L. Marsh III, Richmond, Va., for plaintiffs and plaintiffs-intervenors Brewer and others.

Leonard E. Ryan, Dept. of Justice, Washington, D. C., and W. T. Mason, Jr., Asst. U. S. Atty., Norfolk, Va., for the United States.

Leonard H. Davis, City Atty., Norfolk, Va., for defendants.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

This case marks another round in the City of Norfolk school desegregation history. It has been before this Court, as well as appellate courts, on innumerable occasions.[1] In all of these cases decided on the district court level, the present district judge has written the opinions except James v. Almond, a three-judge court case, in which he participated in the preparation of a *per curiam* opinion.

The most recently decided case on the appellate level is Brewer v. School Board of City of Norfolk, Virginia, 349 F.2d 414 (4 Cir., July 30, 1965), in which the

---

1. This history is shown in the opinions in Beckett v. School Board of City of Norfolk, Virginia, 148 F.Supp. 430 (E.D.Va., 1957), aff. sub nom. School Board of City of Norfolk, Virginia v. Beckett (School Board of City of Newport News, Virginia v. Atkins), 246 F.2d 325 (4 Cir., 1957), cert. den. sub nom. School Board of City of Newport News, Virginia v. Atkins, 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed.2d 63 (1957); School Board of City of Norfolk v. Beckett, 260 F.2d 18 (4 Cir., 1958); Beckett v. School Board of City of Norfolk, 181 F.Supp. 870 (E.D.Va., 1959); Beckett v. School Board of City of Norfolk, 185 F.Supp. 459 (E.D.Va., 1959), aff. sub nom. Hill v. School Board of City of Norfolk, Virginia, 282 F.2d 473 (4 Cir., 1960); Brewer v. School Board of City of Norfolk, Virginia, 349 F.2d 414 (4 Cir., 1965). See, also, the related cases of James v. Almond, 170 F.Supp. 331 (E.D.Va., 1959, a three-judge court); James v. Duckworth, 170 F.Supp. 342 (E.D.Va., 1959), aff. sub nom. Duckworth v. James, 267 F.2d 224 (4 Cir., 1959), cert. den. 361 U.S. 835, 80 S.Ct. 88, 4 L.Ed.2d 76 (1959); Beckett v. School Board of City of Norfolk, 2 Race Rel.L.Rep. 337 (otherwise unreported); Beckett v. School Board of City of Norfolk, 3 Race Rel.L. Rep. 942–964 (otherwise unreported); Harrison v. Day, 200 Va. 439, 106 S.E.2d 636 (1959).

prior order of the district court was vacated and remanded in light of decisions from the United States Court of Appeals for the Fourth Circuit which had been handed down while *Brewer* was in the process of appeal. While faculty desegregation had been the subject of consideration in the district court opinion (unreported) nothing was said on this subject in the brief *per curiam* opinion vacating and remanding the case for further proceedings.

On November 24, 1965, this Court ordered the plaintiffs and defendants to present evidence of the possible impact of faculty allocation on an alleged racial basis as to any plan adopted by the School Board in light of the brief opinion of the United States Supreme Court in Bradley v. School Board, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (November 15, 1965). The *Bradley* case was the first decision of the United States Supreme Court on the necessity of faculty desegregation in the public school system. Nine days after the Supreme Court acted, this District Court entered its order *sua sponte*.

In accordance with the foregoing order the School Board filed its modified plan on December 31, 1965. The plaintiffs filed exceptions to the plan on January 3, 1966. Nine days prior to the scheduled hearing—and several weeks after the Court had conducted a final pretrial conference—the United States, acting through the Attorney General and the Civil Rights Division of the Department of Justice, requested leave to intervene. Leave was granted the United States to intervene and, on February 23, 1966, the United States filed exceptions to the modified plan filed by the School Board on December 31, 1965. The condition of intervention was that all parties would adhere to the final pretrial conference order.

Late Friday afternoon, with the case scheduled for hearing on the following morning, the attorney for the Civil Rights Division advised the judge's office that he was calling approximately 25 witnesses, rather than the 8 or 9 names listed in the final pretrial conference order as agreed to by the parties. This message was not conveyed to the judge until after 5:00 P.M. as the judge was otherwise engaged in the trial of other matters.

When the case was called for hearing on Saturday morning, the attorney for the Civil Rights Division was reprimanded by the Court for his attempt to violate the terms of the final pretrial conference order. The Civil Rights Division then withdrew its request with respect to the additional witnesses. However, the plaintiffs requested a continuance of the hearing, which was granted. The Court fixed another early date but, at the same time, urged all counsel and the school authorities to confer in an effort to present a mutually satisfactory plan. The facilities of court chambers were used and, thereafter, the parties met in rather continuous session.

The final result of these conferences brought forth the plan, approved by the Court with reservations[2] on March 17, 1966, for the 1966–67 school year. That plan is now in operation but, by reason of the construction of Lake Taylor Senior High School, new senior high school lines were required.

As far back as 1960 the Court of Appeals for the Fourth Circuit praised the School Board in *Hill* where it said:

"We give weight also to the past conduct of the School Board and the history it has established, and to the District Court's finding that it is the Board's purpose to proceed in good faith and with reasonable speed in compliance with the direction of the Supreme Court. In light of the District Court's approval of particular procedures as interim measures only, and subject to re-examination from

---

2. The reservations contained in the order of March 17, 1966, and comments as to the constitutionality of same, are discussed in a later portion of this memorandum.

time to time of further plans to effect compliance with the law, the order of the District Court is

Affirmed."

Even the Civil Rights Division concedes that progress is being made in Norfolk. This is what prompted the United States to refrain from filing objections to the 1967–68 proposed plan. Moreover, the only expert testimonial evidence adduced at the hearing on "progress" in Norfolk was that of Dr. Allen H. Wetter, a former Superintendent of Schools in the City of Philadelphia. While the NAACP attempts to minimize Dr. Wetter's qualifications, it is apparent that he is highly qualified educator who, on occasions, has served as a consultant for the Office of Education in the Department of Health, Education and Welfare (HEW). Dr. Wetter compares the "progress" in Norfolk to that of Philadelphia, the City of Brotherly Love. During 1966, in Philadelphia, there were approximately 190 schools; 24 were all-Negro; another 40 were 99% Negro; 23 were all-white; 14 were 99% white. Thus, out of 190 schools, 101 were either all of one race or 99% of one race. Comparable figures were submitted as to faculty desegregation. For example, Lincoln High School with 4000 pupils had one Negro teacher in 1966–67.

While comparison between cities is not in any sense controlling—nor does it indicate compliance with any mandate of the Constitution—it is rather clear that Norfolk's efforts have probably exceeded Philadelphia.

The Norfolk City School Board made its substantial changes in March, 1966, after submitting the agreed plan. When the schools opened on September 6, 1966, the faculties in all eleven junior high schools were integrated; the faculties in all four senior high schools were integrated; the faculties in twenty-eight of the fifty-six elementary schools were integrated. We believe that anyone will agree that such action is beyond the call of "deliberate speed" bearing in mind that the faculty desegregation issue was finally settled by the Supreme Court on November 15, 1965. Faculty desegregation has been accomplished through the cooperative attitude of dedicated teachers and the persuasive powers of the school administrators. Contrary to the accepted practices elsewhere, force, threats and pressure have not been applied.

The 1966–67 plan likewise brought forth a substantial increase in school desegregation. For example, in a two year period the contrast for senior high schools as to Negro pupils is as follows:

| | 1964–65 | 1966–67 |
|---|---|---|
| Maury | 192 | 552 |
| Granby | 24 | 88 |
| Norview | 192 | 273 |
| Booker T. Washington | All Negro | All Negro |

As hereinafter noted, the freedom of choice plan, accepted by the plaintiffs and the United States, has permitted some white children living in the area designated in the 1967–68 plan as Area IV to elect to attend another school. However, under the 1966–67 plan, any *white* child living in that area was required to attend Booker T. Washington or Maury, the latter, as above indicated,

being substantially integrated to the point that the plaintiffs, the United States and the School Board all wish to keep as many white children in attendance as possible, in order to prevent resegregation. It is significant that the 1966–67 plan permitted *Negro* children living in the same area to attend the less integrated Granby and Norview schools, as well as Maury.

The City of Norfolk is peculiarly dependent upon federal activities. It is said that 40% of the entire population is federally connected. Annual federal contributions to the Norfolk City School Board approximate $4,000,000. Additionally, Norfolk has, for many years, been engaged in a redevelopment program which is second to none in the nation for efficiency and effectiveness. This has resulted in additional large sums of federal money being allocated from various branches of the government in Washington, to say nothing of direct naval allocations for defense purposes.

The School Board has become increasingly aware of the attitude of the "keepers-of-the-purse" in Washington. The members of the Board, including one prominent Negro attorney, fully recognize the need for progress in the field of desegregation. Presumably they are likewise cognizant of certain provisions of the Civil Rights Act, 42 U.S.C. § 2000c, defining the term "desegregation" as:

> " 'Desegregation' means the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin, but 'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance."

Likewise, under the section of the Civil Rights Act authorizing the Attorney General to institute an action against a school board under certain conditions, 42 U.S.C. § 2000c–6, it is stated:

> "[P]rovided that nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards."

While this Court believes that the intent of Congress is clear, any discussion of this language falls upon deaf ears in many channels.

Faced with the dilemma of pleasing the "keeper-of-the-purse", complying with constitutional mandates as interpreted by the Supreme Court, and attempting to carry out the intent of Congress in such matters, the School Board has approached the overall problem. The clear and concise testimony of School Board Chairman Thomas adequately demonstrates the sincerity of the Board. That the "money" phase of the problem has perhaps induced the Board to go along with suggestions made by the Civil Rights Division and counsel for the plaintiffs cannot be doubted.

It was in this setting that certain parties sought to intervene for the purpose of filing exceptions to the 1967–68 plan. Feeling that an adversary proceeding was rapidly becoming non-adversary in nature, the Court granted Rosso, et al, permission to intervene. The Court was mindful that there were probably constitutional defects in the 1966–67 plan and, for this reason if none other, would have permitted the parties to appear *amicus curiae* in any event. In short, the "shots" were being called from distant places, and the interests of the community, without preference of one race over another, were in jeopardy.

It is conceded that plaintiffs and Negro intervenors are, in reality, the National Association for the Advancement of Colored People. It is for this reason that reference will be made to the NAACP. This Court has recognized that fact from the date this action was first commenced in 1956. Counsel for the NAACP has rendered an excellent service in urging and insisting upon adherence to the Constitution of the United States as interpreted by the Supreme Court. In many instances this Court has agreed with the arguments advanced by counsel for the NAACP and has rendered its decision accordingly. That the Negro was the victim of racial prejudice in past years cannot be doubted. Now, however, the approach of the NAACP has changed.

Admittedly it is a powerful organization which has taken the leadership in class actions instituted throughout the country. Nevertheless, when a large body of Negro citizens works for three years in an effort to select a site for a new high school which will best serve the community—and when another Negro group indicates its opposition to a mandatory assignment to a high school some eight miles distant—it causes this Court to raise its eyebrows with the inevitable question as to whether the NAACP prosecutes this case in good faith for the class that it represents. As stated in 39 Am.Jur., Parties, § 54, p. 928:

"Those voluntarily assuming the duty to prosecute a class suit are legally and equitably bound faithfully and honestly to discharge such duty. And if the original plaintiff is not, because of his interest, a proper party to conduct a suit on behalf of himself and the others of the class he undertakes to represent, the management may properly be taken from him but his complaint is retained."

There must, of course, be protection afforded against any collusive sacrifice of the rights of absent parties. 67 C.J.S. Parties § 13(3) b, p. 921.

This Court does not intimate or suggest that counsel for the NAACP has been unfaithful or dishonest. As indicated above, they have heretofore performed commendable services for the class they represent. As to some of the issues raised this year, they are probably within their rights in asserting same. But when they object to plans and procedures which inure to the benefit of the Negro community as a whole, they are treading on dangerous ground. Perhaps it would be preferable to permit the NAACP to intervene as a party-plaintiff. The record would then at least be clear as to whom counsel actually represent. The organization could then work openly with the Civil Rights Division, thus making the marriage legal. The Court is fully aware of the force of these statements, but the ultimate concern of this Court is the welfare of the educational system in the City of Norfolk, without regard to race.

The issues directly raised by this year's proceedings are now considered.

## FREEDOM OF CHOICE

The plan submitted by the School Board for the 1966–67 school year was approved by this Court with reluctance and a definite statement that the plan was racially drawn.[3] When approved, it was with full knowledge of the language of the Supreme Court in Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963), but the Court was not desirous of upsetting a plan which was the result of many days of conferences between counsel for the School Board, the Civil Rights Division of the Department of Justice, the Negro plaintiffs, Negro intervenors, and the school administrators. There being no known objectors to the 1966–67 plan, it was deemed appropriate to test its operative effect. There was no exception to nor appeal from the order of March 17, 1966.

Now, by reason of the construction of the new Lake Taylor High

3. The Court added the following comment to its order of March 17, 1966, wherein the plan submitted by the School Board, approved by the Department of Justice and counsel for the NAACP, was sanctioned:

"In approving the plan this day submitted, the Court expressly states that it has taken this action only because it is at the request of the School Board of the City of Norfolk and pursuant to agreement of all interested parties, including the Civil Rights Division of the Department of Justice. This Court has always been of the opinion that matters touching the administration of any public school system should be primarily reserved to the School Board and its administrators. The plan, as submitted, is in fact a racial plan and, in the absence of agreement, would not be approved by the Court. The entry of this order shall not be considered as any judicial precedent with respect to pending or future controversies relating to school desegregation plans."

School (a senior high school) the plan must be revised and new school zone lines drawn for the senior high school areas. The parties permitted to intervene at the start of the proceedings relating to the 1967–68 school year are affected by reason of certain changes. It is well settled that territorial uniformity is not a constitutional requisite. Salsburg v. State of Maryland, 346 U.S. 545, 552, 74 S.Ct. 280, 98 L.Ed. 281 (1954). A school child, even under a freedom of choice, has no inalienable right to choose his school. United States v. Jefferson County Board of Education, 380 F.2d 385 (5 Cir., March 29, 1967). There is, in short, no vested right in any child, or the parent or guardian of any child, to cause a particular child to attend a particular school.

■ This is not, however, the vice of the 1966–67 or 1967–68 plans. As was said in the recently decided *Jefferson County* case (372 F.2d 876):

"To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race."

As proposed,[4] the city is divided into Areas I, II, III, IV and V. Basically the vast majority of students living in Area I will attend the high school in that area, and the same general pattern will apply to all other areas. Students living in Areas I, II, III and V must attend the school in their area and *have no other choice*. Students living in Area IV, served by the present all-Negro pupil Booker T. Washington High School, are given the choice of attending high schools in Areas I, II and III. By reason of the increasing Negro pupil attendance at Maury High School in Area V, students living in Area IV (Booker T. Washington) are not granted a choice to attend Maury High School in Area V. The obvious stated purpose of this

restriction is to prevent resegregation; all parties feeling that the end result would make Area V (Maury) predominantly a Negro school.

The parties allowed to intervene on April 17, 1967, are residents of the Bayview, Riverview and Winona sections of the city. Under the 1966–67 plan Riverview and Winona students attended Granby High School in Area I. Under the 1967–68 plan they will be required to attend Maury High School in Area V; partially to aid the cause in preventing resegregation of Maury, but also because of new natural boundary lines which have been established since Lake Taylor High School will be operative. Under the 1966–67 plan Bayview students attended Granby High School. Under the 1967–68 plan Bayview students will be required to attend Norview High School in Area II. None of these children or their parents or guardians have any other choice. That they have been denied a benefit and had a burden imposed upon them cannot be doubted. For example, Riverview children are within walking distance of Granby High School, if walking to school is legally permissible in this day and age. Walking to Maury High School would be beyond reason. Public transportation for Riverview students to the schools in question does not present any insurmountable differences but, if necessary to compare, the bus transportation from Riverview to Granby High School is far better and involves less walking than from Riverview to Maury. Many of the same arguments could be advanced with respect to students in Bayview and Winona, but it is unnecessary to consider these factors in determining the rights of the parties.

The plans approved for the 1966–67 school year and proposed for the 1967–68 school year are not true freedom-of-choice plans. They more adequately present a Hobson's choice. For 1967–68

---

4. The 1967–68 plan divides the city into five senior high school areas by reason of the construction of Lake Taylor Senior High School. The 1966–67 plan divided the city into three areas as Lake Taylor was not then in operation. The area designated as Sr. H. III contained both Booker T. Washington High School and Maury High School.

they afford a "one-way ticket" for students residing in Areas I, II, III and V, and a "four-way ticket" for students residing in Area IV. It was just this situation which was condemned in *Goss v. Board of Education, supra*; the only difference being that in *Goss* the choices made available were for the purpose of perpetuating segregation, whereas in the present case the purposes are to stimulate integration and prevent resegregation—this despite the fact that the School Board has been severely criticized by counsel for the NAACP and inferentially condemned by the Civil Rights Division of the Department of Justice.

In *Goss*, Mr. Justice Clark, speaking for a unanimous court, said:

"Our task then is to decide whether these transfer provisions are likewise unconstitutional. In doing so, we note that if the transfer provisions were made available to all students regardless of their race and regardless as well of the racial composition of the school to which he requested transfer we would have an entirely different case. Pupils could then at their option (or that of their parents) choose, entirely free of any imposed racial considerations, to remain in the school of their zone or to transfer to another."

It is true that, in *Goss,* the Supreme Court was condemning the "minority to majority" transfer choice, i. e., a plan permitting the minority in one area to transfer to an area where the pupil's majority race was present. Our situation is the reverse of *Goss*. Here, the School Board proposes that one area (Area IV), where the heavily predominant school population is Negro, be permitted to transfer to a school where the majority in attendance will be white.

Only two decisions inferentially support the argument of the School Board, the NAACP and the Department of Justice that transfers from Area IV (Booker T. Washington) are constitutionally permissible and, at the same time, transfers from other areas are not permitted. Presumably, the School Board attempted, in the spring of 1966, to follow the frequently criticized doctrine of *Taylor v. Board of Education of City School District of City of New Rochelle, D.C.,* 191 F.Supp. 181 (January 24, 1961), appeal denied as premature, 288 F.2d 600 (2 Cir., April 13, 1961), 195 F.Supp. 231 (May 31, 1961), affirmed (Moore, J., dissenting) 294 F.2d 36 (2 Cir., August 2, 1961), cert. den. 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339.[5]

The "equal protection" issue in *Taylor* was not considered on the district court level. On appeal, the Second Circuit majority opinion significantly states that "[a] major finding of the court below was that the defendant School Board had deliberately created and maintained Lincoln School as a racially segregated school. This crucial finding is, we conclude, supported by the record." There is nothing in the majority opinion which considers the constitutional rights, if any, which must be accorded to persons living in areas other than Lincoln School which was the subject of the controversy in *Taylor*. However, in the vigorous dissent of Circuit Judge Moore, we find his constitutional objections which indi-

5. In 1963 the New Rochelle case again came before the district judge, Taylor v. Board of Education of City School District of City of New Rochelle, 221 F. Supp. 275 (D.C.1963). The opinion clearly discloses that the original plan was not successful. There had been a "mass exodus" from Lincoln Elementary School which required a closing of the school because it became too expensive to operate. To prevent resegregation in other nearby schools, the court approved a modified plan calling for the specific assignment of Negro pupils remaining in the Lincoln district for the purpose of achieving racial balance and providing for free bus transportation for children living in the Lincoln district to schools more than 1½ and less than 10 miles from their residence. No suggestion has been made in the instant case that free bus transportation be provided for any child, and indeed none should be made.

cate that he, at least, considered the issue when he said (294 F.2d 50):

"The 'equal protection' rights of all the other school children of New Rochelle are completely disregarded. How can a permissive transfer policy be granted only to one out of twelve districts? Why should the Negro child in Mayflower, Columbus or Washington be deprived of the privileges granted to the Lincoln district? If concentration of any one group is 'segregation' (and hence a constitutional violation), why should not the Jewish or Italian child be given equal privileges to transfer? If, as represented, Columbus is in a depressed economic area and over 90% Italian, is not the proper education of a child as important to a resident of the Columbus district as the Lincoln district?

"Regardless of protestations to the contrary, the effect and implications of the decision below are to place the operation of the schools of the country in the hands of the Federal courts or a single judge. His personal views as to those pupils who should be granted or denied transfer will control; he alone will decide what racial mixtures satisfy his concept of integration. Of necessity he will have to pass upon district lines if he chooses to permit neighborhood schools to continue. His decrees will cause schools to be built, altered or abandoned. Attendant thereto might even be an indirect fixing of the city's school tax rate to accomplish his bidding.

"There will be those who will charge that these suggested possibilities are gross exaggerations and that 'It Can't Happen Here.' But if Federal courts undertake the operation, directly or indirectly, of the public schools, what will be the end result? Recent history has noted other government operations originally justified because business improved and the trains ran on time. In short, I believe that the decree takes away from the people, their duly elected or appointed Boards of Education, and from the States themselves their right to decide by democratic processes upon the educational policies for their communities."

To the views of Judge Moore this Court subscribes. It may be argued that it is only a dissent, but it forcefully suggests that the situation can arise. In the present case, it has arisen with respect to the transfers permitted and, allied thereto, the construction of the proposed new high school in Area IV.

The *Taylor* case was decided prior to the Supreme Court decision in *Goss*, as well as many other cases which have touched generally on the subject of permissive transfers.[6] We shall review them briefly.

Reliance is placed upon Board of Education of Oklahoma City Public Schools, etc. v. Dowell, 375 F.2d 158 (10 Cir., January Term 1967). This case upheld a "majority to minority" transfer policy applicable to *all* students. The constitutionality of such a provision has never been questioned by this Court, although Circuit Judge Breitenstein in *Dowell* pointedly suggests that judicial compulsion of the "majority-to-minority transfer policy is indefensible" under *Goss* as it is, in fact, "based on race". Nevertheless, the Court of Appeals for the Fourth Circuit has concluded that transfers *for all* are constitutionally permissible. Brown v. County School Board, 346 F.2d 22 (1965).

 The plaintiffs and the Department of Justice do not want "frozen" school zones. They argue that the choices should be given to the students

---

6. In Blocker v. Board of Education of Manhasset, N. Y., 229 F.Supp. 709 (E.D. N.Y., 1964), the court ordered the School Board to permit Negroes in wholly-Negro Valley Elementary School to transfer to predominantly white schools without allowing the same privilege to white children, but this was occasioned by reason of the School Board's proposal to close Valley School. The *Goss* case is not mentioned in the opinion and no reference is made to the equal protection clause.

living in Area IV where there is a heavily concentrated Negro population, but that other children (even the Negro students) living in the remaining four areas should be required to attend the school in their particular zone. The position is untenable. True, children living in any of the school zones cannot be heard to complain as to the lines denominating a particular area (assuming the constitutionality of such boundary lines) but the equal protection clause commands that if a choice within a given area is granted to child No. 1, an equivalent choice must be given to child No. 2, irrespective of race. The landmark case of Shelley v. Kraemer, 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161—often cited by the NAACP —points out that "[e]qual protection of the laws is not achieved through indiscriminate imposition of inequalities". Thereafter, in Henderson v. United States, 339 U.S. 816, 825–826, 70 S.Ct. 843, 847, 94 L.Ed. 1302, it was said:

"Discriminations that operate to the disadvantage of two groups are not the less to be condemned because their impact is broader than if only one were affected."

While there may be constitutional defects in the choices afforded in the elementary and junior high school systems, no special complaint has been registered to date. To effect a change for the 1967–68 school year may seriously affect the school administration. The School Board may desire to reconsider the choices made available in the elementary and junior high schools and report back to the Court as to contemplated changes, if any, for the 1968–69 school year. Perhaps an appeal from the present ruling will throw more light on the subject.

As to the senior high schools, the Court is of the opinion that any freedom of choice plan requires that an equal choice must be given to *all*. This means that students living within any of the five areas may elect to attend a school outside the areas of their residence. This immediately presents the problem of overcrowding a particular school. The School Board could designate a capacity enrollment for each school, beyond which no additional students will be admitted. If requests for enrollment in a particular school exceed the stated capacity, students residing within that area shall be first admitted. Students living outside of the area shall be admitted according to the proximity of their residence to the school, with those living closest to the school (but outside the area) being entitled to admission over those living at more distant points. In determining "proximity" the Court recognizes that certain large areas such as the Naval Base and Norfolk Municipal Airport may play a part and, to this extent, the School Board may, if it be so advised, eliminate these large governmental areas in computing the "proximity". Likewise, "proximity" may, in the discretion of the School Board, be computed on an accessible road-mileage basis computed from the approximate center of the residential area involved. This would eliminate situations in which the direct-line mileage from a residential area to the school may be considerably less than the accessible road mileage, bearing in mind that certain natural boundaries must be crossed.

The foregoing does not mean that the School Board must give freedom-of-choice to all. Areas III and IV may be consolidated into one geographic assignment system, and thereafter make transfers available on a nondiscriminatory basis in the consolidated area. This was suggested as one alternative in Brown v. County School Board, 346 F.2d 22 (4 Cir., 1965). If this option is selected, the highly controversial boundary line separating Areas III and IV (from Princess Anne Road to the Eastern Branch of the Elizabeth River) would be eliminated.

The final option is to adhere to a strictly geographic scheme of assignments, with each pupil being required to attend the high school in the area where the pupil lives. While this procedure would undoubtedly bring about a very

small percentage of integration in Booker T. Washington High School, it runs the risk of an attack upon its validity in light of the fact that Booker T. Washington would probably continue as a highly segregated school, even though it would draw from a compact area surrounding it.

The School Board shall advise the Court promptly as to its decision with respect to these options.

## THE PROPOSED NEW HIGH SCHOOL

The plan for the 1967–68 school year makes no mention of the new senior high school contemplated to replace the present Booker T. Washington High School. The NAACP objects to the plan as follows:

"The plan fails to inform the Court of the contemplated construction of a new Booker-T Washington High School, land for which is presently being acquired by the school board. Plaintiffs submit that the proposed site for such new building will perpetuate the racially segregated character of that school and that proposed new construction should be cited with a view of furthering the racial desegregation of the school system."

It is quite true that the Civil Rights Division of the Department of Justice filed no objections to the 1967–68 proposed plan. This does not mean that it will not, at a later date, either assist in blocking the project or otherwise object to a devised plan. It was counsel for the Civil Rights Division who initiated the suggestion that a different site should be selected for the new Booker T. Washington High School for the purpose of avoiding the continuance of all-Negro attendance at that school. Various other locations were suggested, but it was apparent that counsel was not familiar with the physical layout of Norfolk as he suggested the Airport and Industrial Park as possible sites. When advised as to the nature of these properties, he essentially abandoned these locations. While the attorney for the Civil Rights Division did state that the site selected by the School Board may turn out to be the only available location, it was still clear that he was not in agreement due to the perpetuation of segregation.

While there is no affirmative evidence that any direct threat has been conveyed indicating a cutoff of funds (or denial of same) if the new high school is finally constructed in the same general area as the present Booker T. Washington High School, the Civil Rights Division concedes that it is a matter of great concern as to the selected site.[7] They point out that the proposed new school will be located within a vast Urban Renewal plan under the sponsorship of the Department of Housing and Urban Development (HUD). They know, and we all know, that federal funds play a prominent part in any such project. At the present writing HUD has not finally approved the project.

In the course of argument counsel for the NAACP and the Civil Rights Division took the position that they should have been consulted prior to selecting the site for the new high school—this

---

7. Eight days after argument the local press carried an account indicating that a lecturer on the faculty of Harvard's Graduate School of Education had visited Norfolk at the request of the Civil Rights Division to study the proposed site location of the new Booker T. Washington High School. The article reflects that the location of the projected $4,500,000 school, regarded as settled in December, 1965, was being reopened. The Department of Housing and Urban Development had previously approved a planning grant of $419,300, and had reserved $7,800,000 in operating funds for the entire redevelopment project. The Court is not advised as to the qualifications of the expert selected but, if approached from the standpoint of sound education and if permitted to work freely with the Norfolk school authorities and Planning Department, there is no reason to doubt the final decision. If, however, the approach is one to "integrate for the sake of integration", without regard to the service to the great body of school children in the area, the problem will remain.

despite the fact that the NAACP has two prominent local attorneys representing the organization and the matters involving the site selection were given wide publicity in the local press. The practical effect of this position creates a grave problem of school administration. This Court concedes that it does not have the knowledge or ability to determine the propriety of site locations for new schools. Perhaps with the exception of the now objecting attorneys, the federal judge is less qualified than anyone else to determine what school site will best serve all children under the law. In two years there have been five new schools constructed and placed in operation in Norfolk. There have been no prior objections to site locations although, as the Court recalls, there was some semblance of a protest when Rosemont was placed in operation. It is fundamental that every new school, wherever situated, may *tend* to perpetuate segregation to a limited extent. If the school is erected in an area where the white population is nearly 100%, it may reasonably be expected that white children will attend same. The reverse is also true. When it appeared that the objectors were serious in their contention that they be fully advised as to contemplated school construction, the Court indicated its willingness to enter an order directing counsel for the Civil Rights Division and NAACP to appear at all sessions of the School Board when matters involving site selection are considered but, if such an order is to be entered, the attorneys for the parties must be present and participate in all discussions with complete authority to make decisions. Consideration of such an order is admittedly ridiculous, but it does appear that the NAACP–Civil Rights combine may well continue to obstruct any attempts to provide a sound educational program for children of all races.

The matter involving a new Booker T. Washington High School has been under study for more than three years. Initially the School Board contemplated renovating the existing facility. When prominent Negro citizens registered their objections, a committee consisting of several hundred people was formed under the name of "The Better Booker T. Washington Committee". The idea of this committee was initiated by the School Board and the groups represented included civic clubs, parent-teacher associations and leaders in the Negro community. The committee formulated an executive group which met with the School Board, the Planning Commission, and other interested bodies over a period of three years. As a result of many meetings, the unanimous decision was to apply for urban renewal funds covering a large educational area, included within which the new school was to be situated, and substantial residential housing would be constructed. Until the Civil Rights Division raised the question during conferences with reference to the 1967–68 plan, it was assumed that the urban renewal plan, including the new Booker T. Washington High School, met with the approval of the large majority of intelligent Negro citizens of Norfolk. Indeed, there is no evidence to the contrary at this time.

This brings us to a consideration of several important points. Initially, what should any school board do in determining locations for new schools? Must they obtain approval of the Civil Rights Division and the NAACP attorneys before instigating plans for a new school? Are they to disregard the wishes of leadership interests of a community and subordinate their planning knowledge and desires to the NAACP attorneys and the Civil Rights Division? When the NAACP attorneys admit that their instructions emanate from their own thoughts or from the higher echelon in this powerful organization, do they any longer represent the class of Negro citizens contemplated by a class action? How may a school board protect itself with respect to the substantial time and expense involved in planning new schools if they must expect prolonged litigation in each instance?

Should the neighborhood school theory be abolished? These and a multitude of other questions come to mind in approaching the practicalities of this problem.

In the final analysis there is one controlling point for determination. Where, as in this case, the only evidence justifying the selection of a different site location is the *possibility* that some white children will be forced into the new school, is this sufficient, standing alone, to override the many advantages which will accrue to the Negro children by reason of having a readily accessible neighborhood senior high school?

Area IV (the Booker T. Washington area) admittedly contains the most compact area of Negro housing. The lines drawn for all areas follow, to a large extent, natural boundaries. While there is dispute with respect to the line separating Area III and Area IV, it must be remembered that in the proposed plan, Area IV pupils would have the choice of attending the high schools in Areas I, II and III. Even if this provision of the plan is unconstitutional, the disputed line could still be eliminated, thereby permitting Area IV pupils to attend Lake Taylor Senior High School.

The true answer is that no organization can change the pattern of racial housing overnight. At one time the section known as Brambleton (in Area IV) was occupied entirely by white people. Only a handful now remain. The same is true as to Chesterfield Heights and Campostella, which have racially changed within the past twenty years and are continuing this same change every day. School sites are not selected from the standpoint of five years' use. Even if the master-minds from our Nation's capital should be permitted to select the sites for all future schools, it affords no assurance that the particular school would remain racially integrated or racially balanced. The only sensible approach to the location of schools is to place the same where they will more conveniently serve the greater number of school children.

What has been said with respect to Area IV is not to suggest that the entire Negro population of Norfolk is contained therein. To the contrary, by reference to the Planning Areas and Planning Districts, *other* sections occupied by the non-white residents are, according to the Court's own familiarity with housing patterns, as generally described in the manner referred to herein. There are 11 sections of the City of Norfolk where there are believed to be no non-white residents, subject to the possibility that certain non-whites may be residing on a temporary or permanent basis as domestic servants with white residents. These 11 sections of Norfolk, with appropriate reference to the number of each planning district are Commodore Park (10), Southern Shopping Center (24), Wards Corner (25), Sewells Point (27), Glenwood Park (28), North Shore (30), Roland Park (34), Denby Park (38), Naval Base Road (39), Kempsville Road (79), and Janaf Shopping Center (87). There are, subject to exceptions indicated about, no non-whites in these sections. In further explanation of the foregoing, it should be noted that not all of these areas constitute residential housing, although there may be a few homes located therein. For example, Southern Shopping Center (24) is a concentrated business area; the same is true as to Wards Corner (25), Naval Base Road (39), and Janaf Shopping Center (87). The section designated as Sewells Point (27) is highly industrialized with manufacturing, shipping and other commercial interests. The section known as Kempsville Road (79) is rural in character. Eliminating these 6 sections from consideration, there remain 5 residential sections where there are no non-white residents, subject to the exception noted above.

Viewing the remainder of the City we must first consider the vast area known as the Naval Base (26). Contained within this section are government housing projects which, of course, are completely integrated. The figures are not available as to the white and non-white fami-

lies at the Naval Base. Apparently, for the first year senior high school children residing on government owned property at the Naval Base will attend Granby High School, whereas during the 1966–67 school year, they attended Maury. This is probably subject to the exception that seniors will not be transferred from Maury to Granby. In any event, we cannot determine the impact, if any, by reason of this change.

Passing to all areas of the City, the estimated percentage of non-white population is as follows:

| SEC. NO. | NAME OF SECTION | SR. H. S. AREA | PERCENTAGE OF NON-WHITE |
|---|---|---|---|
| 1 | Willoughby | I | 14% and Under |
| 2 | West Ocean View | I | " |
| 3 | Pinewell | I | " |
| 4 | Ocean View | II | " |
| 5 | Cape View | II | " |
| 6 | Pretty Lake | II | " |
| 7 | Shore Drive | II | " |
| 8 | Pamlico | I | " |
| 9 | Merrimac Park | I | " |
| 10 | Commodore Park | I | Zero |
| 11 | North Side | I | 14% and Under |
| 12 | Ocean Air | I | " |
| 13 | Willow Terrace | II | " |
| 14 | Snug Harbor | II | " |
| 15 | North Chesapeake Blvd. | II | " |
| 16 | Oakdale Farms | II | " |
| 17 | Bel-Aire | II | " |
| 18 | Roosevelt Gardens | II | " |
| 19 | North Camellia | II | " |
| 20 | South Camellia | III | " |
| 21 | Larrymore | III | " |
| 22 | Azalea | III | " |
| 23 | Municipal Airport | III | 51 to 70% |
| 24 | Southern Shopping Center | I, II & III | Zero |
| 25 | Wards Corner | I | Zero |
| 26 | Naval Base | I | (See Prior Comments) |
| 27 | Sewells Point | I | Zero |
| 28 | Glenwood Park | I | Zero |
| 29 | (Reserved for Future Use) | | |
| 30 | North Shore | I | Zero |
| 31 | Titustown | I | 80 to 100% |
| 32 | Sussex | I | 14% and Under |
| 33 | Suburban | I | " |
| 34 | Roland Park | I | Zero |
| 35 | Lakewood | I | 14% and Under |
| 36 | Talbot Park | I | " |
| 37 | Edgewater-Larchmont | V | " |
| 38 | Denby Park | I & II | Zero |
| 39 | Naval Base Road | I & II | Zero |
| 40 | Chesapeake Manor | II | 80 to 100% |
| 41 | Rosemont | II | 80 to 100% |
| 42 | Coronado | II | 80 to 100% |
| 43 | Sewells Gardens | II | 31 to 50% |

| NO. SEC. | NAME OF SECTION | SR. H. S. AREA | PERCENTAGE OF NON-WHITE |
|---|---|---|---|
| 44 | East Norview | II | 14% and Under |
| 45 | Norview | II & III | " |
| 46 | Norvella | III | " |
| 47 | Estabrook | III | " |
| 48 | Foxhall | III | " |
| 49 | Coleman Place | III | " |
| 50 | Ballentine Place | V | " |
| 51 | Lafayette | V | " |
| 52 | Park Place | V | 51 to 70% |
| 53 | Colonial Place | V | 14% and Under |
| 54 | North Colley | V | " |
| 55 | Old Dominion College | V | 80 to 100% |
| 56 | Lamberts Point | V | 14% and Under |
| | (NOTE: This section is nearly all industrial) | | |
| 57 | West 21st St. | V | 80 to 100% |
| 58 | East 21st St.-Monticello | V | 80 to 100% |
| 59 | Downtown | IV & V | 14% and Under |
| 60 | Medical Center | V | " |
| 61 | West Ghent | V | " |
| 62 | North Ghent | V | " |
| 63 | East Ghent | V | 80 to 100% |
| 64 | Ghent | V | 14% and Under |
| 65 | Tidewater-Young Park | IV | 80 to 100% |
| 66 | Huntersville | IV | 80 to 100% |
| 67 | Lindenwood | IV | 80 to 100% |
| 68 | Tidewater Drive-Industrial | IV | 80 to 100% |
| 69 | Brambleton | IV | 80 to 100% |
| 70 | Liberty-Roberts Park | IV | 80 to 100% |
| 71 | (Reserved for Future Use) | | |
| 72 | Chesterfield | IV | 31 to 50% |
| 73 | Industrial Park | III | 80 to 100% |
| 74 | Cromwell Road-Industrial | III | 14% and Under |
| 75 | River Oaks | III | " |
| 76 | Lake Taylor | III | 51 to 70% |
| 77 | Lake Terrace | III | 14% and Under |
| 78 | Maple Hall-Hollywood | III | " |
| 79 | Kempsville Road | III | Zero |
| 80 | Easton | III | 14% and Under |
| 81 | River Forest | III | " |
| 82 | (Reserved for Future Use) | | |
| 83 | Ingleside | III | 14% and Under |
| 84 | Poplar Halls | III | " |
| 85 | Glenrock | III | 31 to 50% |
| 86 | Crown Point | III | 14% and Under |
| 87 | Janaf Shopping Center | III | Zero |
| 88 | Campostella | IV | 51 to 70% |
| 89 | Diggs Park | IV | 80 to 100% |
| 90 | Berkley | IV | 80 to 100% |

The foregoing figures, other than the designated assignments to senior high school areas, are taken from records in the Norfolk Department of City Planning. The estimates do not include those residing in group quarters such as institutions, hospitals, nursing homes, rooming and boarding houses, military and other types of barracks, college dormitories, fraternity and sorority houses. The estimates are based upon the 1960 U.S. Census of Population and Housing, data from the 1965 City School Census and field work by the Planning Department. The keys to the percentages are:

80 to 100%—very predominantly non-white.

51 to 70%—mixed, but predominantly non-white.

31 to 50%—mixed, but predominantly white.

14% and Under—very predominantly white.

As the racial population shifts from day to day it is, of course, impossible to state the exact housing pattern at any one time. Those sections listed as "Zero" may now have one or more non-white families residing therein. Certainly it is true that Campostella (88) and Chesterfield Heights (72) now have greater percentages of non-white population than when these records were prepared. Heavier percentages of non-whites are also indicated in Park Place (52), Colonial Place (53), North Colley (54), as well as other sections.

The purpose of this analysis is to endeavor, so far as possible, to demonstrate the racial housing pattern as the same is related to the drawing of boundary lines for the senior high school areas. This Court recognizes that, on appeal, judges who are wholly unfamiliar with the City of Norfolk and its housing patterns will be called upon to review the actions of the School Board. To protect any party in interest as to the correctness of this analysis (as the estimates of the percentage population are not in evidence), an immediate hearing will be accorded anyone desiring same for the sole purpose of testing the accuracy of the analysis herein made.

To change the contemplated site of the new high school would be, as the Superintendent of Schools describes it, "tragic". It would mean that hundreds of school children within easy walking distance to Booker T. Washington would be required to resort to public transportation. It would strike at the pocketbooks of that group who can, with exceptions, least afford this additional expense. It would result in dropouts and less regular attendance. In the opinion of this Court a sound educational system is not solely dependent upon integration or its lesser counterpart, desegregation.

Without a crystal ball no one can predict the future housing pattern in Area IV. Especially is this true when we are told that the urban renewal plan contemplates the development of an educational complex with Virginia State College on one end and the new high school near the other end. Residential housing is contemplated as well. While from past experience it may be assumed that the new residential housing under the urban renewal plan will largely accommodate the Negro population, the authorities in Washington may come forward with such an attractive rental basis as to entice a substantial number of white families to occupy this housing.

There is no panacea for racial balance in public schools. The same is true as to housing. One follows the other as night follows day. The only sure cure would be, as applied to the five high schools, to erect them all together in the approximate center of any city where multiple schools are required. When this occurs education will be stopped more effectively than what occurred in the Norfolk school-closing days of September, 1958, to February, 1959. The so-called neighborhood school would cease to exist.

This Court is mindful of the decisions suggesting that a school construction program is an appropriate matter for court consideration. *Wheeler v. Dur-*

ham City Board of Education, 346 F.2d 768, 774 (4 Cir., 1965); Wright v. County School Board of Greensville County, 252 F.Supp. 378, 384 (E.D.Va.1966). Statements are made to the effect that new construction cannot be used to "perpetuate segregation". But when each opinion is studied it appears that the law is pointing its finger at school authorities who are acting with the specific intention of evading the law of the land. To a limited extent, every newly erected school will tend to perpetuate segregation wherever it is constructed. Obviously the intent of the Norfolk City School Board has not been to evade the now-established law—at least since the school-closing days of 1958–59 and even then the School Board vigorously objected to actions of the state and local governing bodies. To the contrary, with respect to Area V where Maury High School is located, efforts are being made to prevent resegregation and, while not in this record (unless contained in the many reports of prior years), large additional quantities of land have been acquired around Maury High School to secure its permanency as an educational institution.

■ The good faith of the School Board cannot be questioned. Indeed, it is considered by many that it has "gone overboard" in an effort to meet the problem. While, acting without a crystal ball, this Court cannot avoid the finding and probable conclusion that the erection of a new high school in the selected location will probably result in a continuance of occupancy by Negro students in Area IV for an indefinite period in the future, the entire weight of the evidence conclusively shows abundant sound educational reasons for such a decision, which was reached only after several years of study by responsible Negro citizens, the School Board and its administration.

Whether urban renewal funds will ultimately be made available for this excellent educational complex is an unknown factor. In any event if they are not forthcoming, the public will know the reason.

The request of counsel for the NAACP to require an amendment of the 1967–68 plan to provide that the new Booker T. Washington High School be relocated will be denied.

## THE NORTHSIDE—ROSEMONT JUNIOR HIGH SCHOOL ISSUE

The NAACP complains that Northside Junior High School will be overcrowded and Rosemont Junior High School will be under-utilized during the 1967–68 school year. Hence, they reason, the Court should order the ninth grade children at Northside to attend Rosemont.

Northside, Rosemont and Azalea Garden are the three junior high schools within a single area. Under the freedom of choice plan for junior high schools in Norfolk, any pupil residing in the overall area wherein Northside, Rosemont and Azalea Garden are located may elect to attend any of said schools. Thus, this plan grants to Negro children the choice of attending the predominantly white Northside and Azalea Garden schools. It likewise gives a choice to any child, irrespective of race, to attend the presently all-Negro pupil Rosemont school.

As of September 30, 1966, the pupil membership at the three schools was as follows:

| | Negro pupils | White pupils |
|---|---|---|
| Northside | 86 | 1644 |
| Rosemont | 198 | 0 |
| Azalea Garden | 10 | 1448 |

As indicated by the Junior High School Map, the distance between Rosemont and Azalea Garden is relatively short. Northside is considerably to the northwest from each of these schools.

It is true that Rosemont is underutilized at the present time. This is due, in part, to a delayed urban redevelopment project which involved the construction of two major highways (one interstate) throughout the general area. The residential stage of this redevelop-

ment area is now in the process of the initial construction phases. As a condition of granting funds for an urban renewal project in Rosemont, the federal government required that a site be set aside for an *additional* school. The long range planning for Rosemont undeniably points to capacity schools in this area. Additionally, Rosemont Junior High School was built as a combination junior high school and elementary school. When the redevelopment project is completed, the two schools will be separated, if and when a new school is constructed.

Northside probably was slightly overcrowded during the 1966–67 school year. Until the freedom of choice forms are received for the 1967–68 school year, it is impossible to predict the extent of overcrowding, if any, which will occur next year. Aside from the foregoing, it should be noted that the boundary lines have been changed to place the Riverview section in another junior high school area. The Riverview children will be required to attend Blair Junior High School where the division of white-Negro pupil membership even appeals to counsel for the NAACP and the Civil Rights Division, with 705 Negro children and 761 white children on the pupil membership roll as of September 30, 1966.

The basic objection to a compulsory transfer of ninth grade children at Northside to Rosemont is that it is a clear violation of the freedom of choice plan. Counsel for plaintiffs do not object to the freedom of choice as it applies to the right of a majority-to-minority transfer of Negro children to predominantly white schools; they want that right and they have it; however, they wish to deprive other children of a like right and, as to white pupils, they are desirous of invoking a minority-to-majority compulsion. For many of the same reasons discussed in other portions of this memorandum relating to freedom of choice, the request of the plaintiffs will be rejected.

## THE CAMPOSTELLA JUNIOR HIGH—LAKE TAYLOR SENIOR HIGH ISSUE

The NAACP requests that the graduating class at Campostella Junior High School be mandatorily assigned to Lake Taylor Senior High School. Under the plan as proposed, these children have the election to attend Lake Taylor Senior High School in Area III. Under one of the options suggested to the School Board—in view of the conclusions reached as to the unconstitutionality of the proposed plan—these children will still have the right to attend Lake Taylor High School.

There are approximately 300 children leaving Campostella Junior High School in June, 1967. In argument, although not in testimony, it was pointed out that the Campostella area is approximately 2 to 2½ miles from Booker T. Washington High School, whereas Lake Taylor Senior High School involves a trip of 8 Miles. Likewise, in argument, although not in evidence, it was stated that the Negro citizens of Campostella had indicated their strong opposition to a compulsory assignment to Lake Taylor Senior High School.

It is conceded that Lake Taylor Senior High School will not be filled to capacity during the 1967–68 school year. The valid reason—not disputed by anyone—is that sound educational practices preclude consideration of transfers of high school seniors to a new school. Thus, for the 1967–68 school year, Lake Taylor will have no senior class. On a one-year basis there would be room for approximately 300 additional children, but what happens the following year? Are the Campostella children then to be evacuated from Lake Taylor High School either by court order or school administration ruling? Who would be the first to "scream" if this occurred? Counsel for the NAACP indicated that the subsequent year could take care of itself. Is this the type planning for school administration that each community wants?

Aside from the reasons previously discussed as to a suggested Northside to Rosemont mandatory transfer—and aside from the total lack of wisdom from an educational standpoint in planning—the NAACP proposal borders on the ridiculous in that many Negro children will be seriously inconvenienced by such a long daily trip. There may be a few families in Campostella who wish to send their children to Lake Taylor and, dependent upon the option selected by the School Board in any freedom of choice plan, this may be possible.

The request for a *mandatory* transfer of the graduating class from Campostella Junior High School to Lake Taylor Senior High School will be denied.

## THE OVERCROWDING AND SEGREGATED CHARACTER OF BOOKER T. WASHINGTON HIGH SCHOOL

Little need be said as to this point. It has been thoroughly considered in the prior discussion relating to the proposed construction of a new high school to replace the existing structure at Booker T. Washington High School. While there are presently no white children in attendance at Booker T. Washington, it is significant to note that 7 white faculty members have been teaching Negro children at this high school during the 1966–67 school year. Even the NAACP and the Civil Rights Division admit that this is "progress" in an effort to eliminate segregation, although they are not satisfied as to goals or timetables.

Furthermore, there is no credible evidence that Booker T. Washington is overcrowded. The Superintendent of Schools, while conceding that all high schools other than Lake Taylor will be "overcrowded" in the sense that "ideal educational conditions" call for a lesser number in attendance, vehemently denies that Booker T. Washington is "overcrowded" by comparison. The highly qualified Director of Research for the School Board has estimated that there will be approximately 2300 children in Area IV (Booker T. Washington) for 1967–68, as well as 1968–69. A few of

these children are white and they obviously have heretofore exercised their freedom of choice by electing to attend high schools in other areas as no white child has, as yet, elected to attend Booker T. Washington. Relatively few Negro children have elected to leave Booker T. Washington, and this is what apparently disturbs the NAACP. Of course, it would be a simple matter to compel some integration at Booker T. Washington by requiring all children to attend the schools in their respective areas, but neither the NAACP nor the Civil Rights Division wants this procedure adopted for Norfolk.

A total of 2277 children attended Booker T. Washington as of September 30, 1966. Norview High School had a pupil membership of 2688, including 273 Negroes. Granby High School had a pupil membership of 2461, including 88 Negroes. Maury High School had a pupil membership of 2250, including 552 Negroes.

Under the 1966–67 plan, Booker T. Washington and Maury were in the same area (Sr.H.III). The 1966–67 plan provided, in part, as follows:

> "The parent or guardian of every high school child residing in Sr.H.III must choose either Maury High School or Booker T. Washington High School, provided, that the parent or guardian of any *Negro* high school child residing in Area Sr.H.III may choose Granby High School or Norview High School."

The foregoing portion of the 1966–67 plan was constitutionally impermissible but, as the school year is now about gone, there is no need to comment further.

Nevertheless, it is logical to assume that some Negro children residing in that portion of Sr.H.III area during the 1966–67 school year, and who will now reside in Area V, elected to attend the all-Negro Booker T. Washington High School. By reason of the construction of Lake Taylor Senior High School, some will now be diverted from Booker

T. Washington to Lake Taylor. Others, now residing in Area V, will be in attendance at Maury. The new boundary lines, drawn largely in accordance with natural boundaries, may well result in a lessening of the pupil enrollment at Booker T. Washington. Until the School Board elects its option and the freedom of choice (if used) forms are compiled, there is no reason to believe that Booker T. Washington will be overcrowded, at least by comparison.

## FACULTY DESEGREGATION

Complaint is made in objections filed by the NAACP—and the subject of a discussion favoring the views of the NAACP in a brief filed by the Civil Rights Division—that faculty desegregation has been too slow; that there are no goals or time schedules as to the attainment of "total" desegregation of faculties; that the faculties should be geared according to race in the corresponding percentages of white and Negro teachers in the three stages of public education, i. e., elementary schools, junior high schools and senior high schools; and, finally, the plan fails to provide for a racially non-segregated faculty at Lake Taylor Senior High School.

This requires a review of the history and legal precedents leading up to faculty desegregation. On June 29, 1963, the Fourth Circuit considered the problem involving faculty desegregation in Jackson v. School Board of City of Lynchburg, Virginia, 321 F.2d 230, 233 (4 Cir., 1963). While it made no express ruling, there is admittedly language in Jackson leading to the belief that a plan effecting a transition to a racially nondiscriminatory school system is broad enough to comprehend all aspects of operation.

On July 23, 1963, the plaintiffs in the present action filed a motion for further relief in which they objected to the policy of assigning principals, teachers and other professional personnel on the basis of race. This was the first time that faculty desegregation entered the pro-

longed litigation which has been pending since 1956.

In Brooks v. County School Board of Arlington County, Va., 324 F.2d 303, 306 (4 Cir., 1963), the court, in commenting upon a resolution declaring against the consideration of race in all future personnel actions, said:

"This measure is worthy of commendation but, again, it is so new that there has been no implementation and no experience under it."

In its memorandum opinion filed July 30, 1964, this Court denied the request for an order to desegregate the faculties holding, in effect, that the issue was not clearly resolved. When the Fourth Circuit vacated and remanded in Brewer v. School Board of City of Norfolk, Virginia, 349 F.2d 414 (4 Cir., 1965), nothing was said with respect to faculty desegregation.

On June 1, 1965—prior to the Court of Appeals decision in Brewer—the case of Wheeler v. Durham City Board of Education, 346 F.2d 768 (4 Cir., 1965), was decided. There the court approved of an order of the lower court requiring the school authorities to make a detailed study of the administrative and other problems involved with respect to the hiring and placement of teachers and other school personnel, but the Fourth Circuit declined to enter an immediate order effectuating the desegregation of faculties and personnel.

This brings us to the Bradley decision by the Supreme Court on November 15, 1965. Thereafter, as heretofore noted, the Norfolk plan was modified and put into effect for the 1966–67 school year. The achievements of the School Board in faculty desegregation have been previously discussed.

What may be done—and what may not be done—in faculty desegregation matters was again before the Fourth Circuit in Wheeler v. Durham City Board of Education, 363 F.2d 738 (4 Cir., 1966).

Circuit Judge Albert V. Bryan there said:[8]

"In the absence of the teachers as parties to this proceeding, we do not think that the order should require any involuntary assignment or reassignment of a teacher. Vacant teacher positions in the future, as the plaintiffs suggest, should be opened to all applicants, and each filled by the best qualified applicant regardless of race. Moreover, the order should encourage transfers at the next session by present members of the faculty to schools in which pupils are wholly or predominantly of a race other than such teachers'. A number of the faculty members have expressed a willingness to do so. Combined with the employment of new teachers regardless of race, this procedure will within a reasonable time effect the desegregation of the faculty. The presence in Durham of wives of students and faculty members of Duke University and North Carolina College who are qualified and available as teachers provides a ready source of supply to meet any demand for teachers of both races."

■ We think it clear from the quoted language that, in the absence of teachers as parties, forced transfer to effect racial balance is prohibited. The City of Norfolk, like Durham, has two colleges[9] which provide some source of supply for teachers. Additionally, Navy wives are sometimes available for teaching.

This is not to say that there exists an abundance of qualified teachers. To the contrary, the competition is keen with Virginia Beach, Chesapeake and Portsmouth, all surrounding Norfolk. It is still a "teacher's market" and a prospective faculty member may be strongly influenced by assurances from competing school administrations as to where the teacher will be assigned. Thus, to

say that a new teacher may be automatically assigned to a school attended predominantly by pupils of a different race does not follow.

Once again we look to the good faith of the School Board. Approximately 133 teachers were persuaded to teach in schools attended predominantly by pupils of the opposite race for the 1966–67 school year. Even more are expected for the 1967–68 year. In argument, the NAACP acknowledged that the school authorities had mailed a letter to all teachers during the spring of 1967 urging them to indicate their willingness to transfer to a school attended primarily or solely by pupils of the opposite race. The NAACP does not complain about this letter. However, in line with the most recent *Wheeler* case, the School Board has not adopted the tactic of compelling a teacher to transfer. Moreover, such a practice would not be in accord with sound educational principles.

Complaint is made that the new Lake Taylor High School will not be sufficiently desegregated. There will be approximately 79 teachers employed at this school for the 1967–68 season. At the time of the hearing on April 17, 1967, thirty had been selected; 23 white and 7 Negro. Until the plan is approved and a definite determination may be made as to faculty requirements, it is not practicable to make further assignments to this new school.

■ The NAACP contends that faculty assignments at each school should be in proportion to the total white-Negro teaching personnel in each of the three phases of schooling, i. e., elementary, junior high and senior high. We attribute no rational basis to this theory. Such a proposal constitutes racial balancing as distinguished from desegregation of faculties. According to the evidence, the Department of Health, Education and Welfare urges the presence

---

8. Counsel for the NAACP and Civil Rights Division stated in argument that they could not understand what the author of the opinion meant or intended. There does not appear any lack of clarity.

9. Old Dominion College (predominantly attended by white students); Virginia State College (predominantly attended by Negro students).

of at least two members of the opposite race on each faculty, if it is possible to achieve this goal. While this Court does not accept the guidelines of HEW as controlling, it is certainly pertinent in disposing of the argument of the NAACP.

The NAACP, in conjunction with the Civil Rights Division, urges this Court to accept the language in Kier v. County School Board of Augusta County, 249 F. Supp. 239, 247 (W.D.Va., 1966), decided by Judge Michie prior to the most recent *Wheeler* case, where it was said:

"Some guideline must be established for the School Board in carrying out the Court's mandate. Insofar as possible, the percentage of Negro teachers in each school in the system should approximate the percentage of the Negro teachers in the entire system for the 1965–66 school session. Such a guideline can not be rigorously adhered to, of course, but the existence of some standard is necessary in order for the Court to evaluate the sufficiency of the steps taken by the school authorities pursuant to the Court's order."

Judge Michie goes further and states that there can be no "freedom of choice" plan for teacher and staff assignments. This appears to be contrary to *Wheeler*, supra. Likewise, Judge Michie relies upon a similar standard adopted in Dowell v. School Board of Oklahoma, 244 F.Supp. 971, 977–978 (W.D.Okl., 1965). A close reading of *Dowell* does not indicate that the district court in Oklahoma went as far as Judge Michie intimates. A prime distinction between Oklahoma City and Norfolk is implicit in the lack of "good faith" in the former. Only 12 out of 107 schools had integrated faculties, and then only where the pupils were also integrated. The district court did follow a recommendation contained in an "Integration Report" setting a goal of 1970 (five years after the decision) by which time there should be the same approximate percentage of non-white teachers in each school as in the entire system. This, said the district court, is "a reasonable and workable standard, providing as it does for stability in school faculties during the integration process, and keying the change to personnel turnover figures indicating that approximately 15% of the total faculty is replaced each year."

On appeal, Board of Education of Oklahoma City Public Schools, etc. v. Dowell, 375 F.2d 158 (10 Cir., 1967), there were three opinions, one of which was a dissent. However, on the faculty desegregation issue the Tenth Circuit set no standard or goal. All that is said on this point is:

"We pass to consideration of the part of the order compelling faculty desegregation. The record reflects that a higher percentage of non-white teaching personnel have master's degrees than do white personnel. The superintendent of schools admitted there was no difference in the quality of performance between the white and non-white personnel. At present, integration of personnel exists only in schools having both white and non-white pupils, with no non-white personnel employed in the central administration section of the system. The existing situation reflects racial discrimination in the assignment of teachers and other personnel. The order to desegregate faculty is certainly a necessary initial step in the effort to cure the evil of racial segregation in the school system."

Since the so-called "standard" geared for 1970 was not essentially before the Tenth Circuit, it is clear that the appellate court had no occasion to approve or disapprove of same, other than to describe as a "necessary initial step" an order to desegregate faculties.

This Court finds no reason for sanctioning such a standard at any time in the foreseeable future. It is merely a balancing of races, and is a far cry from

racial discrimination in the assignment of teachers and other personnel.[10]

 The thrust of the argument of both the NAACP and the Civil Rights Division is the unwillingness or inability on the part of the School Board to set forth in a written plan such factors as deadlines, timetables and percentage goals for faculty and staff desegregation. Having disapproved of percentage goals as an essential to the avoidance of racial discrimination, we turn to deadlines and timetables. Certainly any reasonable-minded person would say, in light of the progress made in 1966–67, "Let the School Board have at least three years to work out the problem." Sometimes, however, reasonable-minded persons are difficult to find. The School Board regularly reports to this Court as to its progress in racial desegregation. Presumably it will continue to do so. Copies of these reports are furnished counsel for the NAACP and Civil Rights Division. In due time all faculties will be integrated but, after only one year's experience, this Court declines to require the fixing of any deadline or timetable. The Court is confident that all faculties will be integrated (at least to the extent that HEW *presently* requires) by the 1970–71 school year. This may be the Court's timetable but should not be referred to in any order to be entered as, in the opinion of the Court, it is wholly unnecessary.

The School Board of the City of Norfolk has a thankless task. Serving without compensation and devoting countless time and effort in endeavoring to comply with the law and, at the same time, maintaining a quality education program, the Board is justly entitled to commendation from the citizens of Norfolk, irrespective of race. There is no hope that they will ever satisfy the NAACP or the Civil Rights Division. Like the judge of this court, they must accept criticism from anyone as graciously as possible, but continue to follow the law as best they can. The Board has made great strides since the dark school-closing days of 1958–59. The members are determined that there shall be no repetition of this tragic error which, of course, was not brought about by the action of the Board. Irrespective of what others may say or do, the present judge of this court will continue to have confidence in their judgment and integrity.

Counsel for the School Board will advise the Court with reasonable promptness as to any modification of the plan for 1967–68 and, as modified, the plan will be approved.

---

10. Unlike Oklahoma City, the School Board of the City of Norfolk has a widely diversified instructional and supervisory personnel working in and out of the central administration offices and not assigned to specific schools. Apparently no complaint on this score is registered by the NAACP and the Civil Rights Division.